Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/01/2023 09:07 AM CDT

NEBRASKA SUPREME COURT ADVANCE SHEETS
315 NEBRASKA REPORTS
STATE v. GALINDO
Cite as 315 Neb. 1

STATE OF NEBRASKA, APPELLEE, V.
JORGE GALINDO, APPELLANT.
___ N.W.2d ___

Filed September 1, 2023.    No. S-21-419.

1. **Postconviction: Constitutional Law: Appeal and Error.** In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.

2. **Postconviction: Judgments: Appeal and Error.** Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law which an appellate court reviews independently of the lower court's ruling.

3. **Postconviction: Constitutional Law.** Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable.

4. **Postconviction: Constitutional Law: Proof.** An evidentiary hearing is not required on a motion for postconviction relief when (1) the motion does not contain factual allegations which, if proved, constitute an infringement of the movant's constitutional rights rendering the judgment void or voidable; (2) the motion alleges only conclusions of fact or law without supporting facts; or (3) the records and files affirmatively show that the defendant is entitled to no relief.

5. **Postconviction.** The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity.

6. **Postconviction: Appeal and Error.** A motion for postconviction relief cannot be used to secure review of issues that were known to the defendant and which were or could have been litigated on direct appeal.

7. **Constitutional Law: Right to Counsel: Conflict of Interest.** A conflict of interest which adversely affects a lawyer's performance violates the client's Sixth Amendment right to effective assistance of counsel.

8. **Effectiveness of Counsel: Conflict of Interest: Words and Phrases.** The phrase "conflict of interest" denotes a situation in which regard for one duty tends to lead to disregard of another; a conflict of interest places a defense attorney in a situation inherently conducive to divided loyalties.

9. **Postconviction: Effectiveness of Counsel: Conflict of Interest: Proof.** In order to obtain relief in a postconviction action based upon the alleged conflict of interest of trial counsel, the defendant must show an actual, as opposed to an imputed, conflict of interest.

10. **Postconviction.** An evidentiary hearing is not required when a motion for postconviction relief alleges only conclusions of fact or law.

11. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

12. ____: ____. To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

13. **Effectiveness of Counsel: Proof: Words and Phrases: Appeal and Error.** To show prejudice under the prejudice component of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome.

14. **Constitutional Law: Effectiveness of Counsel.** A proper ineffective assistance of counsel claim alleges a violation of the fundamental constitutional right to a fair trial.

Appeal from the District Court for Madison County: Robert R. Steinke, Judge. Affirmed.

Adam J. Sipple, of Sipple Law, and David A. Tank for appellant.

Douglas J. Peterson, Attorney General, and James D. Smith for appellee.

Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ., and Stratman and Burns, District Judges.

Per Curiam.

Jorge Galindo appeals the district court order that overruled his motion for postconviction relief without an evidentiary hearing. All of Galindo's claimed errors challenge his five death sentences for murders committed during a bank robbery. Upon our de novo review, we affirm.

## I. BACKGROUND

On September 26, 2002, Galindo, Erick Vela, and Jose Sandoval entered a bank in Norfolk, Nebraska. Their purpose was to carry out robbery plans that Sandoval and Galindo had been formulating for at least a month. In short order, they shot and killed four bank employees and one customer, with Galindo firing the shots that killed one of those five people. Another customer walked in but was able to escape amid at least two shots fired at her by Galindo. Galindo's gunfire did not hit the customer, but she was injured by shattered glass. One of Galindo's bullets struck near the drive-through window of a fast-food restaurant across the street from the bank. Galindo and his accomplices then fled, less than a minute after entering the bank. They had taken nothing. By the time they were apprehended, they had broken into two residences and stolen two vehicles; Galindo acquired the keys to the first vehicle at gunpoint.

Later that day, Galindo, Vela, and Sandoval were apprehended by law enforcement officers, soon after throwing their guns from the second vehicle. Galindo eventually led law enforcement to the guns. He also identified a photograph of an additional accomplice.

A jury found Galindo guilty of five counts of first degree murder, among other offenses. Galindo was sentenced to death for each of the five murders in accordance with the procedures set forth in Neb. Rev. Stat. § 29-2519 et seq. (Reissue 2008).

Before the death sentences were pronounced, a jury found that evidence at the aggravation hearing demonstrated five statutory aggravating circumstances existed for each of the five bank robbery murders: (1) the murder was committed in an effort to conceal the identity of the perpetrator; (2) the murder was especially heinous, atrocious, or cruel or manifested exceptional depravity; (3) at the time of the murder, another murder had been committed; (4) at the time of the murder, Galindo knowingly created a great risk of death to at least several persons; and (5) Galindo had a substantial prior history of serious assaultive or terrorizing criminal activity, based on evidence of his involvement in the murder of Travis Lundell, committed before the bank robbery. See § 29-2523.

Regarding the Lundell murder, the State presented evidence at the aggravation hearing that Galindo recruited Vela to participate in the bank robbery and that to demonstrate Vela was worthy of the scheme, Vela killed Lundell with Galindo's and Sandoval's assistance. Cortney Barritt, who was Galindo's girlfriend at the time of the bank robberies, testified that on the day Lundell died, Galindo told her that he, Vela, and Sandoval had killed Lundell by strangulation and buried his body in a location Galindo later pointed out to Barritt. Evidence showed that Galindo eventually led law enforcement to the location where Lundell's body was recovered. The State's evidence at the aggravation hearing also included the testimony of witnesses who were incarcerated in the same facility as Galindo and his accomplices after the bank robbery: Daniel Animas, Miguel Lopez, and Hector Abendano. Those witnesses testified that during conversations with Galindo, he said that he held Lundell's legs while Vela strangled Lundell and that he helped dispose of Lundell's body.

After the jury found aggravating circumstances existed, the three-judge sentencing panel in turn conducted a hearing to determine the existence of statutory and nonstatutory mitigating circumstances. The sentencing panel then

weighed the mitigating circumstances it found against the aggravating circumstances found by the jury and conducted a proportionality review to determine whether the death penalty should be imposed. Based upon this analysis, it sentenced Galindo to death for each of the five bank robbery murders.

This court affirmed on direct appeal, where Galindo was represented by the same counsel who represented him at trial. See *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009).

In 2011, Galindo timely moved for postconviction relief, pro se. The district court denied relief without an evidentiary hearing, and Galindo appealed. Upon the State's suggestion and Galindo's stipulation, we summarily vacated the judgment and remanded the cause. Consistent with our directions on remand, the district court appointed counsel.

In 2019, Galindo, represented by appointed counsel, filed his first amended motion for postconviction relief. Galindo's postconviction claims fell into three general categories: (1) prosecutorial misconduct claims, (2) ineffective assistance of counsel claims, and (3) additional claims.

Many of Galindo's postconviction claims related to the Lundell murder, a homicide for which Galindo was not convicted but which, as noted, was the basis for an aggravating circumstance supporting the death penalty for the bank robbery murders. We summarize Galindo's factual allegations in more detail in the sections below. But broadly stated, Galindo's postconviction motion claimed that after his direct appeal, he learned that at the time of his trial, the county attorney was himself the subject of an ongoing criminal investigation that linked him to a drug ring. The county attorney's involvement with the drug ring allegedly included purchasing and using or being in the presence of illegal drugs, socializing with the drug ring members, using them as informants, tipping them off about investigations, protecting them from prosecution, and doing other favors. Galindo contended that his aggravation hearing presented an opportunity for the county attorney and his criminal associates to trade favors: In exchange

for the criminal associates' testimony against Galindo, Galindo claimed, the county attorney would recommend leniency in their criminal cases.

Galindo's postconviction motion asserted that circumstances suggested the county attorney directed the cell placement of certain inmates, some connected to the drug ring, with the intention of either eliciting incriminating statements from Galindo and an accomplice or fabricating false testimony against Galindo. The county attorney called some of those inmates—Animas, Lopez, and Abendano—as witnesses against Galindo relative to the Lundell murder. Galindo also made detailed allegations about the outcomes of the informants' own criminal cases, which Galindo characterized as relatively favorable to them and at the behest of the county attorney. Further, Galindo alleged that the county attorney protected Abendano from federal prosecution to avoid exposing the county attorney's own misdeeds to federal scrutiny. According to Galindo's motion, many of these details were either withheld from him by the State or inadequately pursued by his counsel.

The district court denied postconviction relief for all the claims, without an evidentiary hearing, and Galindo now appeals that order. We recount additional relevant details in the analysis below.

## II. ASSIGNMENTS OF ERROR

Galindo assigns, condensed and restated, that the district court erred in the following ways: (1) by denying an evidentiary hearing on Galindo's prosecutorial misconduct claims involving (a) failing to disclose material evidence, (b) orchestrating the solicitation from Galindo of details about Lundell's death, (c) knowingly introducing false evidence, and (d) pursuing the case despite being burdened by a conflict of interest; (2) by denying an evidentiary hearing on Galindo's ineffective assistance of counsel claims involving (a) forgoing a plea disposition, (b) allowing Galindo to assist in locating

Lundell's body, (c) representing Galindo despite a conflict of interest, (d) failing to subject the Lundell allegation to meaningful adversarial testing, (e) failing to raise on appeal objections to jury instructions regarding the aggravating circumstance that the murder was especially heinous, atrocious, or cruel or manifested exceptional depravity, (f) failing to effectively pursue the mitigating circumstances of Galindo's youth, remorse, and drug use, and (g) failing to raise on appeal the denial of a motion to continue to prepare a defense to the Lundell allegation; and (3) by denying relief for other alleged violations of Galindo's constitutional rights involving (a) Galindo's age at the time of the offense, (b) Nebraska's three-judge sentencing procedure, (c) victim impact statements, and (d) the proportionality of the death sentences.

## III. STANDARD OF REVIEW

[1] In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief. *State v. Lotter*, 311 Neb. 878, 976 N.W.2d 721 (2022).

[2] Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law which an appellate court reviews independently of the lower court's ruling. *Id.*

## IV. ANALYSIS

### 1. Overview

Viewed from afar, Galindo's claims for postconviction relief are familiar. He generally asserts the district court erred in denying postconviction relief without first conducting an evidentiary hearing on multiple claims of prosecutorial misconduct, ineffective assistance of counsel, and other alleged violations of his constitutional rights. But the task of resolving each discrete claim requires us to work our way through a web of factual allegations and legal arguments raised in

his 145-page motion for postconviction relief. Many of those allegations pertain to what Galindo considers "[t]he most important contested factual issue in this case": the Lundell murder. Brief for appellant at 27. As we have noted, Galindo was not convicted and sentenced for Lundell's murder, but evidence of Galindo's involvement in that crime prior to the bank robbery led to the jury's finding of the aggravating circumstance that Galindo had a substantial prior history of serious assaultive or terrorizing criminal activity. See § 29-2523(1)(a). Prominently featured in this appeal is Galindo's contention that without this aggravator, he would not have been sentenced to death for the bank robbery murders.

We ultimately conclude that the district court did not err in denying postconviction relief without an evidentiary hearing. We first dispose of claimed constitutional violations that are procedurally barred. We then address Galindo's claim of prosecutorial misconduct by the denial of his right to counsel and conclude that it was insufficiently alleged. We go on to conclude that also insufficiently alleged were Galindo's claims of ineffective assistance of counsel regarding an alleged conflict of interest and a plea disposition. Regarding ineffective assistance of counsel claims about mitigators related to Galindo's drug use and his age, we determine that the record affirmatively shows he is entitled to no postconviction relief. We next assess Galindo's remaining claims of ineffective assistance of counsel and his claims that the State withheld material evidence, and we determine that he cannot make the requisite showing of prejudice. Finally, we address Galindo's remaining claims of prosecutorial misconduct. We conclude that Galindo has failed to show that his claim of a prosecutorial conflict of interest entitled him to an evidentiary hearing, because any such conflict, though worthy of condemnation if true, was harmless beyond a reasonable doubt. We likewise conclude he is not entitled to an evidentiary hearing on his claim that the State knowingly relied on false testimony, because any such testimony was not material.

## 2. General Legal Principles

[3,4] Before turning to Galindo's specific claims, we briefly review the general legal principles that govern appeals from the denial of postconviction relief without an evidentiary hearing. In Nebraska, postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable. *State v. Lotter*, 311 Neb. 878, 976 N.W.2d 721 (2022). An evidentiary hearing is not required on a motion for postconviction relief when (1) the motion does not contain factual allegations which, if proved, constitute an infringement of the movant's constitutional rights rendering the judgment void or voidable; (2) the motion alleges only conclusions of fact or law without supporting facts; or (3) the records and files affirmatively show that the defendant is entitled to no relief. *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022). "In addition to the substantive rules governing postconviction relief, there are procedural rules which can bar postconviction relief regardless of the merits of a particular claim." *State v. Lotter*, 311 Neb. at 887, 976 N.W.2d at 730.

## 3. Claims Conceded as Procedurally Barred

We begin by dispensing with several postconviction claims that are procedurally barred. Galindo's motion for postconviction relief claimed that his death sentences involved violations of his constitutional rights stemming from an alleged absolute bar on the death penalty due to his chronological age at the time of the offenses, Nebraska's three-judge sentencing procedure, victim impact statements in the presentence report, and the alleged disproportionality of the death sentences. The district court denied each of these claims without an evidentiary hearing. On appeal, Galindo concedes that postconviction relief for these claims would ordinarily be unavailable because they were or could have been litigated on direct appeal, but he nonetheless asks us to review them on the merits. We decline to do so.

[5,6] The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity. *State v. Lessley, supra*. We have consistently said that a motion for postconviction relief cannot be used to secure review of issues that were known to the defendant and which were or could have been litigated on direct appeal. *Id.* Our review of the record confirms, as Galindo readily admits in his appellate brief, that the claims listed above were or could have been litigated on direct appeal. See *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009). Galindo suggests that despite this, we should review these claims on the merits because they arise in a capital case involving allegations that his counsel at trial and on appeal was burdened by a conflict of interest and rendered other forms of ineffective assistance. Galindo cites no authority for this position, and we are unpersuaded. We have previously applied procedural bars in capital cases. See, e.g., *State v. Lotter, supra*; *State v. Ryan*, 257 Neb. 635, 601 N.W.2d 473 (1999). And Galindo has not asserted that his counsel was ineffective in not raising the claims listed above on direct appeal.

### 4. Prosecutorial Misconduct: Right to Counsel

Once adversary proceedings have commenced against an individual, that individual has a Sixth Amendment right to legal representation during interrogation by the government. *Brewer v. Williams*, 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977). In a line of decisions beginning with *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), the U.S. Supreme Court has repeatedly held that the government violates this right when it deliberately elicits incriminating statements from the defendant in the absence of counsel after the defendant has been charged. See, *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986); *Maine v. Moulton*, 474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985); *United States v. Henry*, 447

U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980). This may occur when information is obtained via a government informant, but "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. at 176. "[A] defendant must demonstrate that the [government] and [its] informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. at 459. This right to be free from uncounseled interrogation is infringed at the time of the interrogation, not when the incriminating statements are admitted into evidence, but the deprivation of the right to counsel demands the remedy of exclusion from the prosecution's case in chief. *Kansas v. Ventris*, 556 U.S. 586, 129 S. Ct. 1841, 173 L. Ed. 2d 801 (2009).

Relying on the *Massiah* line of decisions, Galindo assigns that the district court erred in not holding an evidentiary hearing on his postconviction claim that his right to counsel was violated when the State "orchestrat[ed] the solicitation from Galindo of statements regarding the Lundell death while Galindo was jailed." Brief for appellant at 3. Because Galindo's postconviction motion either misapplies this right to counsel doctrine or fails to make sufficient factual allegations to support one of its elements, we are unconvinced.

In the simplest terms, Galindo's postconviction motion claimed that after trial, he learned facts suggesting that testimony by Animas, Lopez, and Abendano about Galindo's involvement in the Lundell murder resulted from a plan, put into motion by the county attorney during Galindo's pretrial incarceration, that violated Galindo's right to counsel. The details about that alleged plan are rather complicated.

Galindo's postconviction motion posited that the informants' testimony in his case arose from deals they had made with the county attorney to obtain relatively favorable dispositions in their own criminal cases. Galindo alleged, as we have

generally noted, that the county attorney was involved with a drug ring that included Jesse Padilla, Lopez, and Abendano, among others. These three and Animas were incarcerated in the same facility as Galindo following the bank robbery.

Galindo's postconviction motion claimed that to facilitate the informants' assistance to the county attorney, at various times and in various combinations, jail officials housed the informants with each other, with Galindo, and with others who had personal knowledge of the Lundell murder. According to Galindo, these housing placements both contravened internal jail procedures and, it could be inferred from this and the drug ring associations, occurred at the direction of the county attorney. As further support for this inference, Galindo alleged that in 2017, the jail administrator "became extremely defensive and agitated" when Galindo's defense team asked him about housing placements, and that without prompting, the jail administrator "emphatically denied" that the county attorney, whom the jail administrator identified as a friend, directed the jail administrator to place any particular inmates together.

Galindo further specifically claimed that according to federal investigative reports, a fellow inmate of Abendano's reported that Abendano had said the county attorney offered to help with Abendano's criminal charges if Abendano provided information about Galindo and Vela and if Abendano agreed not to disclose to federal authorities his drug-ring history with the county attorney. Galindo asserted that after Abendano told police that Galindo admitted he was involved in the Lundell murder, the county attorney told Sandoval that the county attorney would be getting "'good information'" about Galindo and Vela "'in the next couple of days.'" Six days later, Galindo alleged, Lopez told law enforcement that Galindo had admitted his involvement in Lundell's death. Moreover, Galindo's motion for postconviction relief cited a confidential witness who reported having observed the county attorney with a list of people involved with drugs; the

county attorney allegedly told the confidential witness that the people on the list could possibly be used as witnesses against Galindo and his accomplices.

Galindo's postconviction motion concluded that as a whole, these allegations "strongly support[ed] an inference" that the county attorney encouraged or specifically instructed multiple jailhouse informants to elicit incriminating statements from Galindo and/or Vela outside the presence of counsel, and/or to fabricate false testimony against Galindo regarding the Lundell murder.

The district court denied postconviction relief for this claim without an evidentiary hearing.

Now on appeal, Galindo asserts that his factual allegations regarding the jail cell assignments, in combination with the motives he attributed to the county attorney and the informants in the drug ring, warranted an evidentiary hearing. Galindo argues that the nonconforming cell assignments "simply could not have occurred by accident or happenstance." Brief for appellant at 58. In keeping with his postconviction motion, he concludes:

> These facts support an inference [that the county attorney] intentionally engaged Abendano to elicit incriminating statements from Galindo. And since Vela had knowledge of how Lundell was killed, Padilla and Abendano's placement in Vela's cell provided them the opportunity to gain this knowledge from Vela and then elicit (or falsely attribute) incriminating statements regarding the death from Galindo.
>
> These allegations clearly warrant an evidentiary hearing regarding whether [the county attorney] utilized Abendano and Padilla to deliberately elicit incriminating statements from Vela and to repeat Vela's statements to other inmates, . . . so that the other inmates, along with Abendano, could seek leniency or other reward in exchange for their testimony.

*Id*. at 58-59.

To the extent Galindo claims a violation of his right to counsel based on Vela's uncounseled statements, his claim fails. Sixth Amendment rights are personal. See *Pointer v. Texas*, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). Even if Vela made incriminating statements while deprived of legal representation, Galindo does not have standing to mount a challenge based on Vela's right to counsel. See, *Jefferson v. State*, 358 Ga. App. 297, 855 S.E.2d 43 (2021); *People v. Velez*, 155 A.D.2d 708, 548 N.Y.S.2d 272 (1989).

Neither do we believe an evidentiary hearing was required based on Galindo's assertion that the county attorney orchestrated events so that informants would have access to Galindo to elicit incriminating statements from him or to falsely attribute incriminating statements to him. Even if we were to read the constellation of inferences suggested by Galindo to reveal a plan to obtain incriminating statements from him in his counsel's absence, Galindo's postconviction motion omits specific factual allegations of an important element of a Sixth Amendment right to counsel claim: *how* the statements are obtained once an informant has gained access to the defendant.

We understand Galindo to rely primarily on *United States v. Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980). In *Henry*, government agents engaged an informant serving a term in the same jail as several federal prisoners, including the defendant, who was incarcerated pending trial on bank robbery charges. Authorities "told [the informant] to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question [the defendant] regarding the bank robbery." *Id.*, 447 U.S. at 266. The informant and the defendant engaged in "'some conversations'" during which the defendant told the informant about the robbery. *Id.*, 447 U.S. at 271. The informant testified about these conversations, and the defendant was convicted. The U.S. Supreme Court held that the government had "'deliberately elicited'" incriminating statements from the defendant

within the meaning of *Massiah* by virtue of the government's "intentionally creating a situation likely to induce [the defendant] to make incriminating statements." *United States v. Henry*, 447 U.S. at 270, 274. The *Henry* Court reasoned that instructions not to question the defendant neither disproved that the government intended to obtain incriminating statements nor disproved that the government contemplated that its informant would take affirmative action to obtain incriminating statements.

As one commentator has articulated:

> A . . . question which may be asked about *Henry* is whether it extends *Massiah* so as to include both "active" and "passive" efforts to obtain incriminating evidence from a defendant. . . . [T]he majority did not believe it was dealing with a "passive" type of case. Moreover, the majority cautioned it was not "called upon to pass on the situation where an informant is placed in close proximity but makes no effort to stimulate conversations about the crime charged." Yet the majority's loose language about the government being barred from "intentionally creating a situation likely to induce [the defendant] to make incriminating statements" could be read as covering the "passive" type of case as well.

2 Wayne R. LaFave et al., Criminal Procedure § 6.4(g) at 774 (4th ed. 2015).

But the U.S. Supreme Court subsequently clarified in *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986), another "jail plant" case, that "[a] defendant must demonstrate that the [government] and [its] informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." "[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation," and "a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily,

reported his incriminating statements to the police." *Kuhlmann v. Wilson*, 477 U.S. at 459. The *Kuhlmann* Court held that the incriminating statements in that case had not been "'deliberately elicited,'" because although the cellmate remarked that the defendant's initial statements denying involvement in the crime "'didn't sound too good,'" it was not until after a visit from a family member who expressed concern about the defendant's involvement in a murder that the defendant changed his story and made incriminating statements to the cellmate. 477 U.S. at 460.

Galindo argues, apparently relying on *Henry*, that the allegedly intentional placement of inmates "constitutes an additional investigative tactic beyond 'merely listening.'" Brief for appellant at 58. We cannot agree. Galindo asserts that the other inmates elicited incriminating statements from him, but he makes no specific allegations about what techniques the informants employed that made their efforts active rather than passive. Claiming that the statements were elicited is merely a conclusion of fact without supporting facts to show a *Massiah* violation and cannot be the basis for an evidentiary hearing. Because Galindo has not alleged how his interactions with the informants involved some manner of interrogation beyond merely listening, he has not alleged facts sufficient to support this claim.

## 5. Ineffective Assistance of Counsel: Conflict of Interest

[7] A conflict of interest which adversely affects a lawyer's performance violates the client's Sixth Amendment right to effective assistance of counsel. *State v. Jackson*, 275 Neb. 434, 747 N.W.2d 418 (2008). On appeal, Galindo contends that the district court erred in denying an evidentiary hearing on his postconviction claim that his defense counsel was burdened by a conflict of interest. We determine this claim was insufficiently alleged.

Galindo's postconviction motion alleged that a paralegal for his trial counsel was romantically involved with an attorney who represented jailhouse informants. The informants included Padilla, Lopez, and Abendano. Lopez and Abendano testified at the aggravation hearing regarding the Lundell murder, and their charged offenses were unconnected to Galindo's. Galindo's aggravation hearing occurred in December 2003. Galindo alleged that the romantic relationship between the paralegal and the attorney spanned from May or June 2004 to early February 2005.

According to the postconviction motion, the paralegal actively participated in trial preparation and had access to all aspects of Galindo's file, which contained attorney-client conference notes. This, Galindo claimed, created an "opportunity" for the paralegal to share the information with "others." Galindo alleged that the paralegal had admitted that she sometimes shared with the attorney privileged information she obtained from one or more of her employer's clients; this information suggested the attorney was under investigation. Galindo alleged the attorney was ultimately convicted on drug charges due to his involvement with the same drug distribution ring that included witnesses at Galindo's aggravation hearing and the county attorney. Galindo alleged that Abendano had told a fellow inmate that someone in the drug ring had distributed methamphetamine to Galindo, who shared it with one of the bank robbery accomplices.

Galindo's motion concluded that the paralegal's involvement in the case adversely affected his counsel's performance. The district court rejected this claim for relief because it lacked specific facts.

On appeal, although Galindo concedes that the romantic relationship "may have occurred subsequent to [his] trial," he argues that his motion supported a reasonable inference that the paralegal breached duties of loyalty and confidentiality owed to him. Brief for appellant at 70. He contends that an evidentiary hearing is necessary to address whether the

paralegal disclosed his confidential communications and trial strategy to the attorney and whether defense counsel's employment of the paralegal otherwise prejudiced Galindo's right to effective assistance of counsel.

[8-10] We are not convinced that Galindo's motion for postconviction relief made allegations of a conflict of interest sufficient to justify an evidentiary hearing. The phrase "conflict of interest" denotes a situation in which regard for one duty tends to lead to disregard of another; a conflict of interest places a defense attorney in a situation inherently conducive to divided loyalties. *State v. Reddick*, 230 Neb. 218, 430 N.W.2d 542 (1988). In order to obtain relief in a postconviction action based upon the alleged conflict of interest of trial counsel, the defendant must show an actual, as opposed to an imputed, conflict of interest. *State v. Harris*, 274 Neb. 40, 735 N.W.2d 774 (2007). A speculative or hypothetical conflict of interest cannot support overturning a conviction because of ineffective assistance of counsel. See *State v. Vanness*, 300 Neb. 159, 912 N.W.2d 736 (2018). See, also, *State v. Marchese*, 245 Neb. 975, 515 N.W.2d 670 (1994) (mere possibility of lawyer's conflict of interest is insufficient to impugn criminal conviction). Similarly, an evidentiary hearing is not required when the motion for postconviction relief alleges only conclusions of fact or law. See *State v. Cook*, 290 Neb. 381, 860 N.W.2d 408 (2015).

While Galindo asserts that the paralegal behaved in a way we cannot condone, we agree with the district court that Galindo's allegation is "short on facts and long on conclusions and speculation of any actual conflict of interest involving the paralegal sharing any confidential information about Galindo's case with anyone." Standing alone, Galindo's assertion that the paralegal had, at some point, shared information about a case or cases with an attorney, who represented witnesses at Galindo's aggravation hearing in matters unrelated to the charges against Galindo, about an investigation of that attorney's role in a drug distribution ring of which Galindo was

not a member, even if true, does not allege an infringement of Galindo's right to effective assistance of counsel. At most, he alleged the remote possibility of an imputed conflict of interest, not an actual conflict of interest on the part of his counsel warranting postconviction relief. See *State v. Harris, supra*. But see Neb. Ct. R. of Prof. Cond. § 3-501.10, comment 4 (paralegal's conflict of interest prohibiting involvement in case is not imputed to attorney). We discern no claim of "anything more than a speculative or hypothetical conflict of interest" on the part of the paralegal. See *State v. Sandoval*, 280 Neb. 309, 347, 788 N.W.2d 172, 208 (2010).

Because Galindo has failed to allege any facts relating to this claimed conflict of interest that would render the judgment void or voidable, we conclude that the district court did not err in denying him an evidentiary hearing for this claim. See *State v. Lotter*, 311 Neb. 878, 976 N.W.2d 721 (2022).

### 6. Ineffective Assistance of Counsel: Plea Disposition

Galindo argues on appeal that the district court erred in declining to grant an evidentiary hearing on his postconviction claim that his trial counsel was ineffective for not pursuing a guilty plea, a strategy that Galindo asserted would have resulted in life sentences for the homicides. Galindo based this claim in part on *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), which effectively invalidated Nebraska's statutory capital sentencing procedure that permitted a judicial panel rather than a jury to determine whether aggravating circumstances existed. Galindo asserted that *Ring* created a window of time in his case to enter life-saving pleas before revised procedures took effect and that his counsel was ineffective in not seizing the opportunity. As we will explain, because this claim hinges on the presiding judge's alleged misapplication of *Ring* in another case, Galindo has failed to assert facts showing that his trial counsel acted ineffectively in forgoing a plea disposition.

As we explained in Galindo's direct appeal, the release of *Ring* in 2002 prompted changes to Nebraska's death penalty procedure that played a part in Galindo's case:

> Now, as at the time of the bank robbery, a defendant found guilty of first degree murder can be sentenced to death only if one of the enumerated aggravating circumstances is found. [§ 29-2519.] Without any aggravating circumstances, the sentence is life imprisonment. [*Id.*] The ultimate decision of whether to impose the death penalty when the defendant is found "death eligible" depends on whether the aggravating circumstances outweigh mitigating circumstances, as well as a proportionality review. [See § 29-2522.] At the time of the bank robbery, the statutory scheme committed to the judge, and not a jury, both the capital sentencing factfinding of any aggravating and mitigating circumstances and the ultimate sentencing decision. [§ 29-2522.] Approximately 3 months before the bank robbery took place, however, the U.S. Supreme Court had concluded in *Ring* that the Sixth Amendment entitled capital defendants to a jury determination of any fact on which the Legislature conditions an increase in their maximum punishment.
>
> After the robbery, but before Galindo's trial, the Legislature enacted [2002 Neb. Laws,] L.B. 1, which did not change the nature of the statutory aggravating circumstances that make a defendant death eligible. But, it provided that the existence of any of these circumstances must be determined by a jury, instead of a judge, unless this right is waived by the defendant.

*State v. Galindo*, 278 Neb. 599, 613-14, 774 N.W.2d 190, 209-10 (2009). The State's initial information, charging Galindo with five counts of first degree murder, among other offenses, was filed before the Legislature enacted 2002 Neb. Laws, L.B. 1, and did not seek the death penalty. But when L.B. 1 took effect, the State immediately initiated procedures to pursue the death penalty by filing an amended information

with notice of aggravating circumstances. See Neb. Rev. Stat. § 29-1603 (Reissue 2008). Galindo was tried and sentenced accordingly.

In a pretrial motion to quash, Galindo's counsel argued there was no enforceable death penalty at the time the crimes were committed, after *Ring* and prior to L.B. 1, and that the death penalty could not be applied retroactively; the judge who presided over the guilt phase of the proceedings rejected this argument. Galindo's counsel made the same argument before the sentencing panel, again without success. On direct appeal, we affirmed the sentencing panel's ruling, finding no merit to Galindo's position that there was no death penalty in effect when the crimes were committed. See *State v. Galindo, supra*.

Galindo's postconviction motion now at issue also invoked *Ring*, this time in the context of an ineffective assistance of counsel allegation. The postconviction motion claimed that *Ring* and several other factors made the weeks between the initial information and the enactment of L.B. 1 an opportune time to enter pleas to avoid the death penalty. Galindo alleged that during that period, the presiding judge in his case ruled in an unrelated first degree murder case that, in Galindo's words, "based on the decision in *Ring*[,] the death penalty could not be applied . . . if sought by the State." Galindo asserted that on the same day as that ruling, the county attorney in Galindo's case sent a letter to Galindo's counsel suggesting the county attorney might not pursue the death penalty, considering Galindo's role in the crimes compared to his accomplices' roles. Galindo alleged that at that time, he did not oppose pleading guilty to the charges, for which there was no feasible defense, and had entrusted his counsel with the decision whether to do so. Galindo claimed that although his counsel referred to the presiding judge's ruling in the unrelated case in subsequent unidentified pleadings in Galindo's case, his counsel did not advise him to plead guilty or otherwise pursue such pleas. Given all this, Galindo's

motion claimed his trial counsel was ineffective in not facilitating guilty pleas prior to the enactment of L.B. 1, pleas that Galindo asserted had a reasonable probability of resulting in life sentences.

The district court, noting that this court had rejected the argument that there was no death penalty in effect during the months prior to L.B. 1, found that Galindo based this postconviction claim on a speculative and legally unviable strategy and denied relief without an evidentiary hearing. Galindo now challenges this ruling on appeal.

As the district court observed, we have found no merit to the contention that between the release of *Ring* and the revised procedures in L.B. 1, there was no death penalty in effect in Nebraska. See *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009). See, also, *State v. Vela* (*Vela II*), 297 Neb. 227, 900 N.W.2d 8 (2017); *State v. Sandoval*, 280 Neb. 309, 788 N.W.2d 172 (2010); *State v. Vela* (*Vela I*), 279 Neb. 94, 777 N.W.2d 266 (2010); *State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008). In so holding, we reasoned that L.B. 1 changed only the procedures for determining whether to impose the death penalty, rather than the substance, because L.B. 1 did not alter the quantum of punishment for first degree murder. See *id*. In *Vela I*, we explained that "the death penalty did not disappear from Nebraska law during the approximately 5-month period between the decision in *Ring* and the enactment of L.B. 1. Before, during, and after that period, Nebraska statutes provided that the maximum penalty for first degree murder was death." 279 Neb. at 109-10, 777 N.W.2d at 282.

In this appeal, Galindo does not dispute that the death penalty remained in effect between the release of *Ring* and L.B. 1's enactment, but he asserts that his postconviction claim presented a different issue:

> Galindo's claim does not depend on whether there was a death penalty prior to passage of L.B. 1, but rather whether he received adequate counsel regarding the

available opportunity to plead guilty in front of a judge unwilling to impose the death penalty prior to the bill's passage, just as another Madison County defendant . . . did when Galindo's case was pending.

Brief for appellant at 67. Galindo characterizes such a plea as a "viable strategy to save his life." *Id*. at 68.

[11] Certainly, the right to effective assistance of counsel extends to the plea context, see, e.g., *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019), but the facts alleged in Galindo's motion for postconviction relief do not demonstrate a violation of this right. To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022). Galindo's alleged facts failed to satisfy either prong of this test.

[12] We do not view counsel's representation here to be deficient as alleged by Galindo. To show that counsel's performance was deficient, the defendant must show it did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* In other words, the defendant must show that counsel's representation fell below an objective standard of reasonableness. See *State v. Wagner*, 271 Neb. 253, 710 N.W.2d 627 (2006), citing *Strickland v. Washington, supra*. The entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable. See *State v. Munoz*, 309 Neb. 285, 959 N.W.2d 806 (2021). And we have said that "trial strategy based on a misunderstanding of the law is not reasonable." See *State v. Sidzyik*, 292 Neb. 263, 269, 871 N.W.2d 803, 808 (2015). Galindo's allegations suggest that the presiding judge's ruling in the unrelated case was founded on a misapplication of *Ring* and that his counsel should have pursued the same misapplication in his case through precisely timed guilty pleas. But it would not have

been objectively reasonable for Galindo's trial counsel to advise Galindo to plead guilty based on the presiding judge's mistaken notion that the death penalty could not apply in an unrelated case, with the expectation that the presiding judge would make the same ruling in Galindo's case. Galindo, moreover, overlooks the consequences of pleading to the charges that his counsel avoided. Had he entered such pleas, he would have waived all defenses to the charges, some of which he later raised in his motion to quash, while forgoing the benefits of a trial. See *State v. Thomas*, 311 Neb. 989, 977 N.W.2d 258 (2022). Given these considerations, it is arguable that entering a plea would have reflected deficient performance by Galindo's counsel.

[13] Even if we were to accept that Galindo's trial counsel performed deficiently as he contends, Galindo's ineffective assistance of counsel claim would still fail because he did not allege facts that show prejudice resulted. To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Ellis*, 311 Neb. 862, 975 N.W.2d 530 (2022). A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *Id.* "'The likelihood of a different result must be substantial, not just conceivable.'" *State v. Newman*, 310 Neb. 463, 472-73, 966 N.W.2d 860, 869 (2021), quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). To succeed, a claim of prejudice cannot be merely speculative. See *State v. Gibbs*, 238 Neb. 268, 470 N.W.2d 558 (1991). See, also, *State v. McGurk*, 3 Neb. App. 778, 532 N.W.2d 354 (1995). Galindo's claim appears to depend on the presiding judge's continued misapplication of *Ring*, but even assuming the presiding judge misapplied *Ring* in the unrelated case as Galindo suggests, we do

not discern a reasonable probability that the presiding judge would have continued in such error. In fact, a few months after the allegedly ideal window to plea had passed, the presiding judge's ruling on Galindo's motion to quash rejected the notion that *Ring* precluded the application of the death penalty in Galindo's case. Rather than alleging facts showing a reasonable probability that guilty pleas would have resulted in life sentences, Galindo can offer only speculation.

For these reasons, we conclude that Galindo did not allege facts sufficient to support this claim of ineffective assistance of counsel.

### 7. Ineffective Assistance of Counsel: Drug Use as Mitigator

Galindo assigns that the district court wrongly denied him an evidentiary hearing on his claim that his trial counsel provided ineffective assistance during the mitigation hearing on the issue of his drug use. We reject this claim because the record affirmatively shows that Galindo is entitled to no relief. See *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022).

At the mitigation hearing, Galindo's counsel presented evidence about Galindo's methamphetamine use during the months preceding the deadly bank robbery. This included the testimony of Claudia Solis, who had used methamphetamine with Galindo at Barritt's residence. She testified she had seen Galindo use methamphetamine weekly at Barritt's home during a period beginning about 4 months before the bank robbery and ending about 1½ months before the bank robbery. She testified that between that period and the bank robbery, her contact with Galindo increased and his methamphetamine use continued, but she did not observe Galindo during the days immediately preceding the bank robbery.

Solis testified about the effect methamphetamine had on Galindo. Solis had observed Galindo to be awake several days at a time due to his methamphetamine use. Solis recounted

that they would not go out when they used methamphetamine and that Galindo would play video games and talk. Upon questioning by the State, she affirmed that when Galindo used methamphetamine, he became "mellow, happy, giggly," but she also testified to his "[l]ooking like when they would look out the window constantly or any little noise." Solis recalled occasions when Barritt needed Galindo to care for their children after he had been up all night using methamphetamine, and "he was just antsy, he couldn't do it." Solis denied seeing Galindo get "totally out of control" due to methamphetamine use. She testified that Barritt told her about a time Galindo held a knife to Barritt's throat, but Solis did not know whether Galindo was under the influence of methamphetamine at the time. Galindo's counsel also presented the deposition testimony of Barritt, in which she said that Galindo became physically abusive toward her after he became a methamphetamine user.

Galindo's counsel called Carlos Flores to testify. He stated that he used methamphetamine with Galindo almost daily during the weeks preceding the bank robbery. He testified that on more than one occasion, that use involved staying up for 2 or 3 days at a time, or perhaps more, continuously consuming methamphetamine. Flores testified that he was not with Galindo during the 2 or 3 days immediately prior to the bank robbery.

Marco Quijano testified on behalf of the defense that from 1998 to 2001, he binged on methamphetamine with Galindo nearly every weekend. Quijano recalled that on approximately five occasions, he and Galindo stayed up continuously using methamphetamine for 6 days.

Galindo's counsel presented the deposition testimony of Destiny Williams. Williams identified Galindo as a heavy methamphetamine user and an alcoholic. She testified to speaking with Galindo after the bank robbery and to Galindo's saying he was "fucked up" or "[m]essed up" during the robbery and did not remember much about it.

Defense counsel also presented expert testimony by Dr. Alex Stalcup, the medical director of a drug treatment center. Stalcup reviewed reports supplied to him by a mitigation specialist and was present for the testimony of Solis, Flores, and Quijano. Based on all this, he opined that at the time of the bank robbery, Galindo was a methamphetamine addict who was under the influence of the drug and sleep deprived. He explained that as an addict, Galindo's drug use was out of control and his executive functioning and ability to reason, reflect, weigh consequences, and consider right and wrong were compromised.

Galindo's counsel elicited testimony from Stalcup that methamphetamine users can become fearful, paranoid, and hypervigilant and may experience the illusion that they are brilliant and functioning when in fact they are chaotic. He testified that once binge behavior is established, as it had been for Galindo based on others' testimony, it becomes the predominant pattern of use of a methamphetamine addict. Galindo's counsel presented the telephone records from the residence where Galindo was staying before the bank robbery, and they indicated late-night telephone calls from the residence during the 2 or 3 days prior to the bank robbery. According to Stalcup, this, along with testimony that Galindo had a ready supply of methamphetamine, supported his opinion that Galindo was awake during that period, using methamphetamine.

Stalcup testified that the fact that Galindo engaged in planning and preparation for the bank robbery strengthened his opinion because methamphetamine addicts are capable of spending days making a detailed plan. He testified that Galindo's firing of multiple gunshots during the bank robbery was consistent with someone in a frightened state. Stalcup acknowledged that he was not aware of reports that Galindo was cooperative and appeared rational after his arrest, but Stalcup testified that this would not be inconsistent with Galindo's having used methamphetamine for several days before the bank robbery, noting that behavior can be affected

by the level of environmental stimulation. He explained that if the ambient stimulation is relatively low, an individual with methamphetamine intoxication can maintain linear and coherent thought.

The State presented the testimony of several law enforcement officers who observed that Galindo did not appear to be on drugs when he was arrested a few hours after the bank robbery or during the subsequent days.

The sentencing panel concluded that Galindo's drug use did not impair his ability to appreciate the wrongfulness of his conduct or his ability to conform his conduct to the requirements of the law, and the panel therefore did not apply the statutory mitigating circumstance set forth in § 29-2523(2)(g). In so finding, it explicitly discredited Stalcup's opinion. The sentencing panel referred to the State's evidence that Galindo helped plan the bank robbery and took deliberate action while carrying it out and fleeing. It also noted that the law enforcement officers who interacted with Galindo after his arrest testified that Galindo exhibited normal behavior with no signs of impairment. The sentencing panel's order did not mention Galindo's drug use in discussing nonstatutory mitigating circumstances; nor did it mention Solis' testimony that Barritt had told her Galindo had held a knife to Barritt's throat.

Regarding drug use, Galindo's postconviction motion asserted that his counsel was ineffective in conducting an incomplete mitigation investigation. Due to this allegedly incomplete investigation, Galindo claimed, his counsel failed to inform Stalcup about reports of various law enforcement officers that Galindo did not appear to be under the influence of drugs at the time of his arrest or in the days that followed. Galindo asserted that because of this failure to prepare Stalcup, the sentencing panel discredited his opinion. Galindo further identified unnamed witnesses who had observed Galindo under the influence of methamphetamine during the weeks and days immediately before the bank robbery, and he asserted that a proper investigation would have uncovered these witnesses.

Galindo's motion also claimed that his counsel was ineffective in calling Solis, because her testimony that methamphetamine had a mellowing effect on Galindo contradicted Stalcup's testimony that people under the influence of methamphetamine can be hypervigilant and aggressive and have an exaggerated sense of fear. Galindo additionally asserted that Solis' testimony about Barritt's statement that Galindo had held a knife to Barritt's throat provided further damaging information about Galindo's past violent behavior. Galindo concluded that if this alleged deficient performance had not occurred, there was a reasonable "possibility" that the sentencing panel would have considered Galindo's drug use as a statutory or nonstatutory mitigating circumstance.

The district court found that counsel's performance was not deficient and that Galindo had not suffered prejudice.

Now on appeal, Galindo argues that his counsel inadequately investigated the issue of drug use and addiction and failed to interview witnesses who had observed Galindo at the time of his arrest. Due to this, Galindo contends, Stalcup was unaware that numerous law enforcement officers reported that Galindo did not appear to be under the influence of any drugs around the time of his arrest. The record, however, demonstrates that Galindo's counsel did not perform deficiently. Faced with a substantial factual record of Galindo's planning of, preparation for, and participation in the bank robbery and the flight afterward, Galindo's counsel elicited testimony from Stalcup that Galindo was a methamphetamine addict and that his actions during the robbery were consistent with those of someone intoxicated by the drug. Although reports about Galindo's behavior around the time of his arrest were not provided to Stalcup, Galindo's counsel elicited Stalcup's testimony that even if Galindo appeared cooperative and rational at that time, such behavior could be consistent with the influence of methamphetamine. The sentencing panel simply did not accept Stalcup's explanation of Galindo's behavior. We conclude that defense counsel's approach did not fall below

an objective standard of reasonableness such that it was deficient. See *State v. Wagner*, 271 Neb. 253, 710 N.W.2d 627 (2006), citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Galindo further asserts that his counsel's failure to investigate other potential witnesses resulted in counsel's instead calling Solis, whose testimony that methamphetamine had a mellowing effect on Galindo was "inconsistent" with Stalcup's opinions. Brief for appellant at 91. Our reading of the record reveals no such inconsistency and therefore no deficient performance. The range of symptoms of methamphetamine intoxication identified by Stalcup included appearing to be rational and cooperative when ambient stimulation is low, and Solis testified that she observed Galindo using methamphetamine at Barritt's home. Moreover, Solis also suggested that methamphetamine use left Galindo "[l]ooking like when they would look out the window constantly or any little noise" and too "antsy" to care for his children, which was consistent with other possible symptoms of methamphetamine intoxication described by Stalcup.

Finally, Galindo contends that ineffective assistance of counsel resulted in Solis' testimony that Barritt had told her that Galindo had previously held a knife to Barritt's throat. According to Galindo, an adequate investigation would have revealed Solis' knowledge of Barritt's allegation and led counsel not to call Solis as a witness. We disagree that Galindo's counsel performed deficiently in this regard. Based on Barritt's deposition testimony, Galindo's counsel was already aware that Galindo had perpetrated domestic abuse, and while Solis' testimony did add a single violent act to a significant record of other violent acts perpetrated by Galindo, it, along with Barritt's testimony, also tended to link Galindo's violence to his methamphetamine use. Establishing this link was the purpose of Solis' testimony and had the potential to support Galindo's drug use as a mitigating circumstance, a benefit that conceivably outweighed any risk of attributing more

violence to Galindo. If, indeed, Galindo's counsel did forgo investigating Solis' perception of Galindo's relationship with Barritt, the decision was objectively reasonable.

We are not persuaded that Galindo has alleged instances of deficient performance related to Galindo's drug use. Rather, we discern defense counsel's reasonable efforts to connect Galindo's methamphetamine use and addiction to his actions on the day of the fatal bank robbery. Therefore, the district court did not err in rejecting Galindo's request for an evidentiary hearing on this alleged instance of ineffective assistance of counsel. See *State v. Ellis*, 311 Neb. 862, 975 N.W.2d 530 (2022).

### 8. Ineffective Assistance of Counsel: Mitigators Involving Age

#### (a) Age-Related Brain Development as Nonstatutory Mitigator

Galindo was 21 years old at the time of the charged homicides. At the mitigation hearing, Galindo's counsel presented the testimony of educators and relatives who had observed that he was immature for his age and easily influenced by others, including the more mature, charistmatic, and intimidating Sandoval. Galindo's counsel also engaged a clinical neuropsychologist to examine Galindo and presented that expert's testimony about Galindo's level of cognitive functioning. The expert's assessment compared Galindo with other individuals in his age group with a similar level of education. Regarding Galindo's maturity level and intellect, the expert testified that Galindo showed signs of "cognitive immaturity" and had an elevated risk of undue influence by others because of his "dampened intellect." The expert also opined that Galindo's language and executive skills, viewed in the context of his borderline to low-average reasoning skills, affected his ability to make appropriate judgments. Asked about Galindo's "prognosis," the expert testified that Galindo was still a "young individual" and that young individuals have a "greater chance

for change" than middle-aged adults. The sentencing panel did not find Galindo's age, cognitive function, or cognitive development to be mitigating circumstances in any way.

Galindo's motion for postconviction relief cited scientific studies demonstrating that regions of the brain that govern risk awareness and the ability to control impulses do not fully develop until a person's midtwenties. He claimed that his counsel provided ineffective assistance at the mitigation hearing in failing to solicit and present evidence about the relevance of Galindo's characteristics based on his age-related brain development.

On appeal, Galindo assigns that the district court erred in denying an evidentiary hearing on this claim of ineffective assistance of counsel. According to Galindo, because his age is an aspect of his character, its potential as a mitigating circumstance should have been obvious to his counsel. Therefore, he asserts his counsel was deficient in not eliciting opinions about Galindo's age and about how his age-related characteristics influenced his culpability. Had counsel done so, Galindo believes the sentencing panel would have considered his age and concluded that the balance of aggravating and mitigating circumstances did not warrant death sentences. We do not share Galindo's view.

Galindo cites U.S. Supreme Court authority that a sentencing panel may not exclude relevant mitigating evidence from consideration, see *Eddings v. Oklahoma*, 455 U.S. 104, 106 S. Ct. 869, 71 L. Ed. 2d 1 (1982), and that a defendant's age is one of the individualized mitigating circumstances that the sentencing panel must be allowed to consider, see *Stanford v. Kentucky*, 492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989), *abrogated on other grounds, Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). He further points out that in *Roper*, the U.S. Supreme court held that execution of individuals who were under the age of 18 at the time of their capital crimes is prohibited by the 8th and

14th Amendments. *Roper* noted research on the differences in the juvenile brain, as compared to the adult brain, to support its holding.

Relying on this authority, Galindo essentially claims that his counsel should have presented generalized evidence of the brain development of persons in their early twenties relative to the brain development of adults whose brains have reached full maturity. While it does not appear Galindo's counsel presented the issue in this way, his counsel did put on abundant personalized evidence about Galindo's age-related characteristics and development. This included expert evidence that compared Galindo's cognitive functioning to that of other individuals his age and concluded that Galindo's specific characteristics rendered him more at risk of undue influence by others and diminished his ability to make appropriate judgments. It also included testimony by individuals who had personally observed Galindo over the years and described him as immature compared to his same-aged peers and easily influenced. We recognize the distinction between what was presented and what Galindo says ought to have been, but we do not agree that it amounts to deficient performance. Galindo's counsel could have reasonably decided that specific evidence about Galindo's maturity would equal or exceed the benefits of presenting generalized studies. The record demonstrates that Galindo is entitled to no relief on this claim, because his counsel's treatment of the issue equaled that of a lawyer with ordinary training and skill in criminal law. See *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022). See, also, *State v. Wagner*, 271 Neb. 253, 710 N.W.2d 627 (2006).

### (b) Chronological Age as
### Statutory Mitigator

As we have noted, Galindo was convicted of homicides committed when he was 21 years old. In sentencing Galindo, the panel declined to consider his chronological age as a statutory mitigating circumstance under § 29-2523(2)(d).

The panel explained that *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999), had interpreted this statutory mitigator to refer only to a person of advanced years where senility may be involved. Galindo's counsel did not challenge this finding on direct appeal, and Galindo's postconviction motion asserted this was ineffective assistance. In this appeal, Galindo assigns that the district court erred in not holding an evidentiary hearing on his postconviction claim that his appellate counsel was ineffective in failing to raise the sentencing panel's explicit refusal to consider youth as a mitigating circumstance. Because we are not persuaded that Galindo's appellate counsel performed deficiently in this regard, this claim fails.

As it did when Galindo was sentenced, § 29-2523(2)(d) designates "[t]he age of the defendant at the time of the crime" as a statutory mitigating circumstance. In *Lotter*, we rejected the notion that this language applied to any capital defendant with an ascertainable age. See § 29-2523(2)(d). We cited our earlier determination in *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977), *disapproved on other grounds, State v. Reeves*, 234 Neb. 711, 453 N.W.2d 359 (1990), that § 29-2523(2)(d) refers only to a child of tender age, a juvenile, or a person of advanced years, where senility may be involved. We recognized that after *Simants* was decided, the Legislature absolutely prohibited the imposition of the death penalty on anyone under the age of 18 at the time the crime was committed. See Neb. Rev. Stat. § 28-105.01 (Reissue 2016). We explained that § 28-105.01 narrowed the application of the mitigating circumstance in § 29-2523(2)(d) to persons of advanced years. We concluded that only a capital defendant who was a person of advanced years at the time of the homicide could receive the benefit of this statutory mitigating circumstance.

On appeal, Galindo argues that the sentencing panel's reliance on *Lotter* was "clearly erroneous." Brief for appellant

at 88. Again, he points to subsequent U.S. Supreme Court decisions in "*Eddings*, . . . *Stanford*[, and] *Roper*" for support. *Id*. at 87. See, *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (execution of individuals under age of 18 at time of capital crimes is prohibited by 8th and 14th Amendments); *Stanford v. Kentucky*, 492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989) (defendant's age is one of individualized mitigating circumstances that sentencing panel must be allowed to consider); and *Eddings v. Oklahoma*, 455 U.S. 104, 106 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (sentencing panel may not exclude relevant mitigating evidence from consideration). Galindo contends that the sentencing panel contravened this authority when it explicitly refused to consider Galindo's age as a statutory mitigating circumstance under § 29-2523(2)(d).

Galindo seems to take the position that in declining to apply § 29-2523(2)(d) to him, the sentencing panel concluded that it could not consider his age at all. We disagree. The sentencing panel correctly read *Lotter* in deciding that the mitigating circumstance in § 29-2523(2)(d) did not exist in Galindo's case because he was not a person of advanced years. And contrary to Galindo's argument, *Lotter* does not preclude the sentencing panel from using a capital defendant's age or related considerations as *nonstatutory* mitigating circumstances. See § 29-2521(3) (allowing for presentation of any relevant mitigating circumstances, including, but not limited to, statutory mitigators). See, also, *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005) (finding procedure in § 29-2521(3) provides constitutionally sufficient opportunity to adduce evidence relevant to mitigation).

Based on the foregoing, we conclude that the record shows Galindo is not entitled to relief on his claim that his appellate counsel performed deficiently in not opposing the sentencing panel's treatment of § 29-2523(2)(d). See *State v. Ellis*, 311 Neb. 862, 975 N.W.2d 530 (2022).

### 9. *BRADY* WITHHOLDING CLAIMS AND REMAINING CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

Most of Galindo's remaining claims assert additional instances of ineffective assistance of counsel and that the prosecution committed violations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Galindo contends that these constitutional violations underlie the jury's findings that the statutory aggravating circumstances in § 29-2523(1)(a) and (d) apply in his case and the sentencing panel's finding that the nonstatutory mitigating circumstance of remorse does not, such that the legal basis for his death sentences is called into question. Galindo believes that these claims, taken individually or together, merit an evidentiary hearing.

We can conceive of various reasons why some of these claims may fail, but there is one shortcoming that they all have in common. As we will explain in more detail, each of these claims require Galindo to show that he suffered prejudice, and our inquiry for each is fundamentally the same: whether there is a reasonable probability that, had the offending conduct not occurred, the result of the proceeding would have been different. See, *State v. Ellis, supra* (analyzing ineffective assistance of counsel claim); *State v. Harris*, 296 Neb. 317, 893 N.W.2d 440 (2017) (summarizing analysis for *Brady* claims). Applying this standard below, we conclude that even if § 29-2523(1)(a) and (d) were removed from consideration and the nonstatutory mitigating circumstance of remorse were added, there is not a reasonable probability that the result of the proceeding would have been different—that is, that Galindo would not have been sentenced to death. Therefore, the district court did not err in denying Galindo an evidentiary hearing on any of these claims.

### (a) Disputed Aggravating and Mitigating Circumstances

For the sake of completeness, we briefly describe the *Brady* and ineffective assistance of counsel claims by which

Galindo challenges the application of the statutory aggravating circumstances in § 29-2523(1)(a) and (d) and the sentencing panel's finding that the nonstatutory mitigating circumstance of remorse does not apply.

### (i) Substantial Prior History of Serious Assaultive or Terrorizing Criminal Activity Under § 29-2523(1)(a) Due to Lundell Murder

#### a. *Brady* Claims

On appeal, Galindo challenges the district court's denial of an evidentiary hearing on his postconviction claims that the State violated its duty to disclose under *Brady v. Maryland, supra*, and its progeny. This claim rests on various allegations that the prosecution failed to disclose information prior to trial and also rebuffed postconviction counsel's efforts to discover such information during postconviction proceedings. As explained below, all of the allegedly withheld materials involve evidence supporting the § 29-2523(1)(a) aggravator based on the Lundell murder.

Galindo makes several arguments that pertain to the credibility of Lopez and Abendano, who testified about Galindo's involvement in the Lundell murder. He contends that he was entitled to an evidentiary hearing on his postconviction claim that the State withheld evidence that Lopez and Abendano were protected by the county attorney as members of a drug ring. Galindo posits that this evidence would have shown that Lopez and Abendano were "indebted" to the county attorney and that had the jury been aware of this indebtedness, it would have reached a different result; that is, the jury would not have found their testimony about the Lundell murder credible. Brief for appellant at 49. Galindo further asserts that "independent of the claims regarding [the county attorney's] alleged participation in a drug conspiracy," an evidentiary hearing is required on his postconviction claim that the county attorney withheld evidence that Abendano sold a large quantity of methamphetamine to Lopez. *Id*. at 47. According

to Galindo, this association called into question Abendano's and Lopez' credibility and motivations for testifying against Galindo regarding the Lundell murder.

Galindo makes other *Brady* arguments that go to the credibility of testimony regarding the Lundell murder. Also "independent" of his allegations that the county attorney was involved in a drug ring, Galindo contends that an evidentiary hearing is required for his claim that the State failed to disclose Abendano's status as an informant. *Id*. at 50. Galindo additionally argues that evidence of inducements provided to Abendano in exchange for his testimony was not disclosed to him. And Galindo makes similar arguments concerning Kristi Petzold, whose testimony provided circumstantial evidence linking Galindo to the disposal of Lundell's body. Galindo further asserts that an evidentiary hearing is warranted on his claim that the State withheld evidence of inducements provided to Barritt in exchange for information about the Lundell murder.

Galindo acknowledges that his *Brady* claim regarding the testimony of Trista Wiest goes directly to the aggravating circumstance based on Lundell's murder. Wiest testified at the aggravation hearing that she loaned her car to Sandoval around the time of Lundell's death, suggesting that the car was used to dispose of Lundell's body. Galindo argues that an evidentiary hearing was required on his postconviction claim that the State withheld evidence regarding the search and forensic testing of the car's trunk for trace evidence of Lundell's body.

Finally, Galindo claims that he is entitled to an evidentiary hearing on his postconviction claim that the State committed ongoing *Brady* violations when it did not disclose information Galindo requested to prepare his postconviction motion regarding the Lundell evidence. We are not certain that *Brady* provides the proper framework for this claim. See *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009)

(finding *Brady* was "wrong framework" for claim based on failure of State to turn over DNA evidence for postconviction proceeding, reasoning *Brady* is a "trial right" and movant had "already been found guilty at a fair trial"). But even if it does, as we explain below, Galindo cannot meet the materiality standard of *Brady*.

### (b) Ineffective Assistance of Counsel Claims

Several of Galindo's remaining claims of ineffective assistance of counsel relate to the § 29-2523(1)(a) aggravator premised on the Lundell murder.

In this regard, Galindo takes issue with his trial counsel's performance. First, he assigns that the district court erred in not allowing an evidentiary hearing on his postconviction claim that his trial counsel was ineffective in allowing him to waive his privilege against self-incrimination when he assisted law enforcement in locating Lundell's body. Second, Galindo assigns that the district court erred in denying him an evidentiary hearing on his postconviction claim that his counsel was ineffective in several instances by not mounting a meaningful defense to the State's case regarding the (1)(a) aggravator. Galindo suggests that he suffered prejudice as a result of these alleged instances of deficient performance.

Regarding his appellate counsel, Galindo assigns and argues that his counsel on direct appeal was ineffective in failing to argue Galindo's rights were violated by the district court's denial of a pretrial motion to continue. He asserts that without the continuance, his counsel was unprepared to defend him against the (1)(a) aggravator.

*(ii) Especially Heinous, Atrocious, or Cruel, or
Manifested Exceptional Depravity by Ordinary
Standards of Morality and Intelligence
Under § 29-2523(1)(d)*

On appeal, Galindo assigns that the district court erred in not granting an evidentiary hearing on his postconviction

motion's claim that his counsel was ineffective in failing to appeal based on his objections to jury instructions for the § 29-2523(1)(d) aggravator, which applies if "[t]he murder was especially heinous, atrocious, [or] cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence." See *State v. Torres*, 283 Neb. 142, 812 N.W.2d 213 (2012). Galindo essentially asserts in this appeal that the instruction was unconstitutionally vague and failed to suitably direct and limit the discretion of the sentencing body. He alleges that had the matter been raised on direct appeal, this court would have found that the instruction was erroneous and ordered a new aggravation hearing.

### (iii) Nonstatutory Mitigating
### Circumstance of Remorse

Galindo's appellate brief assigns that the district court erred in rejecting his request for an evidentiary hearing on his postconviction claim about remorse. He contends that although his counsel argued to the sentencing panel that he had "'real remorse,'" his counsel rendered ineffective assistance by failing to present any evidence of expressions of remorse Galindo made to multiple people. Galindo's brief cites the following specific allegations from his postconviction motion.

Galindo's motion asserted that Lopez, who was incarcerated with Galindo after the bank robbery, testified during a pretrial deposition that Galindo would tremble, shake, and cry while anguishing over the bank robbery and that other inmates would sing him to sleep at night so that he would stop crying. According to Galindo's postconviction motion, Lopez also said that Galindo acknowledged that what he had done was wrong and cried every time his parents and children visited him. Galindo's motion also alleged Abendano testified at a pretrial deposition that Galindo said he very much regretted the bank robbery and that whenever Galindo recalled it, he became serious and started crying. Galindo's motion further contended that a jail administrator told a defense investigator

that Galindo had expressed remorse about the bank robbery to him and a deputy. Finally, Galindo's motion noted that his mother reported that he was extremely distraught over his role in the bank robbery.

According to Galindo, but for his counsel's deficient performance in not presenting this evidence of remorse, there is a reasonable probability that the outcome of the sentencing proceeding would have been different, especially given that the sentencing panel explicitly relied on Galindo's apparent lack of remorse to counterbalance the mitigating circumstance of Galindo's assistance in locating Lundell's body.

We take this opportunity to note that the presentence report that was before the sentencing panel for consideration suggested that at times, Galindo showed a lack of remorse. The presentence report reflects that Animas, who was incarcerated with Galindo after the bank robbery, told police that Galindo was calm when he talked about the bank robbery, but would get emotional when he talked about his girlfriend and say he "regrets doing this." However, Animas also said Galindo was "not bothered" by the murders and would make jokes about them and "crack up laughing." For example, Animas said that Galindo once saw a shadow near their cell and joked that maybe it was the people they killed coming back to haunt them. Animas reported that Galindo said he anticipated serving 25 years in prison and being in good physical shape upon his release because he would work out. However, in an interview with police included in the presentence report, Abendano, another fellow inmate of Galindo's, said that Galindo acted as if he was sorry for the bank robbery and sad for what he had done.

### (b) Analytical Framework

The rudimentary principles of ineffective assistance of counsel and *Brady* violations are central to resolving most of Galindo's remaining claims.

[14] A proper ineffective assistance of counsel claim alleges a violation of the fundamental constitutional right to a fair

trial. *State v. Cullen*, 311 Neb. 383, 972 N.W.2d 391 (2022). See, also, *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002) (this right has been accorded not for its own sake, but because of its effect on accused's ability to receive fair trial). We have already recited the necessary components of this claim, but they bear repeating here. To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022). To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Ellis*, 311 Neb. 862, 975 N.W.2d 530 (2022). A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *Id.* "'The likelihood of a different result must be substantial, not just conceivable.'" *State v. Newman*, 310 Neb. 463, 472-73, 966 N.W.2d 860, 869 (2021), quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

A functionally identical prejudice analysis is at play in assessing a claim under *Brady* and its progeny. Such a claim must allege that due process has been violated because the prosecution has failed to disclose favorable evidence that is material to guilt or punishment. See *State v. Harris*, 296 Neb. 317, 893 N.W.2d 440 (2017). In *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), the U.S. Supreme Court adopted the standard of materiality for all claims of prosecutorial suppression of favorable material evidence that it had relied on in *Strickland* for claims of ineffective assistance of counsel: "The evidence is material

only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." The claimant need not show that acquittal was more likely than not had the evidence been disclosed. See *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Rather, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.*, 514 U.S. at 434. The claimant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*, 514 U.S. at 435.

Given these standards, our examination of Galindo's remaining claims of ineffective assistance of counsel and *Brady* violations begins and ends with a prejudice analysis. Even if Galindo can show that his counsel performed deficiently as he has alleged, if he was not prejudiced by that conduct, his ineffective assistance of counsel claims fail. Likewise, even if Galindo has alleged facts showing that the prosecution withheld favorable evidence from him, if it did not result in prejudice, his *Brady* claims fail. To analyze prejudice, our task for both types of claims is to decide whether there is a reasonable probability that, had the offending conduct not occurred, the result of the proceeding would have been different. That is, for Galindo to prevail, we must conclude that his allegations, if true, undermine confidence in the outcome: the imposition of death sentences. Galindo suggests that these claimed transgressions led to the application of the statutory aggravating circumstances in § 29-2523(1)(a) and (d) and to the omission of the nonstatutory mitigating circumstance of remorse. But even if Galindo is correct, if we find there is no reasonable probability he would not have been sentenced to death absent the alleged deficient performance and failures to disclose evidence, he has not shown prejudice and his ineffective assistance of counsel claims and *Brady* claims are not grounds for an evidentiary hearing.

For this reason, for the sake of analysis, we take as true Galindo's remaining allegations that his counsel performed deficiently and his allegations that the State withheld evidence; we omit the purportedly offending aggravating circumstances from our consideration, add the mitigating circumstance advanced by Galindo, and assess the remaining aggravators against the remaining mitigators to decide whether there is a reasonable probability that they would have resulted in death sentences. See, e.g., *Sears v. Upton*, 561 U.S. 945, 130 S. Ct. 3259, 177 L. Ed. 2d 1025 (2010) (to evaluate probability of different outcome under *Strickland*, court considers totality of available mitigation evidence and aggravation evidence); *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (when assessing prejudice resulting from alleged ineffective assistance of counsel at penalty phase of capital trial, court "reweigh[s]" evidence in aggravation against totality of available mitigating evidence); *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (considering how omitted evidence would have altered sentencing profile in capital case and whether it would have changed conclusion that aggravating circumstances outweighed mitigating circumstances). See § 29-2522(1) and (2). And in Nebraska, this analysis includes the additional step of considering whether there is a reasonable probability that the sentencing panel would have found death sentences would not be excessive or disproportionate compared to the penalty imposed in similar cases. See § 29-2522(3).

To the extent that Galindo characterizes this framing of the matter as a flawed or impermissible harmless error analysis, he misunderstands the nature of the errors he has alleged. For both ineffective assistance of counsel and *Brady* claims, "the requirement of showing prejudice . . . stems from the very definition of the right at issue; it is not a matter of showing that the violation was harmless, but of showing that a violation of the right . . . *occurred*." *United States v.*

*Gonzalez-Lopez*, 548 U.S. 140, 150, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006) (emphasis in original) (discussing ineffective assistance of counsel). We now proceed to explain why Galindo failed to make factual allegations that support a finding that any such violations occurred here. See *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022).

### (c) Application

To conduct the prejudice analysis for Galindo's remaining claims of ineffective assistance of counsel and his *Brady* claims, we must consider "the totality of the evidence" before the sentencing panel. See *Strickland v. Washington*, 466 U.S. at 695. As the U.S. Supreme Court explained in *Strickland*,

> [s]ome of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

466 U.S. at 695-96. We recognize that in conducting an analysis of this sort, rarely will there be perfect evidence of what the sentencing panel would have done under alternate circumstances, but, in this case, the panel's order gives us guidance in deciding what it was reasonably probable to have done. With these considerations in mind, we start by recounting the panel's analysis and ultimately conclude that no reasonable probability of a different outcome exists here.

### (i) Sentencing Panel's Order

As it does still, § 29-2522 instructed the three-judge sentencing panel in Galindo's case to base the sentences on the following considerations: whether the aggravating circumstances as determined to exist justified the imposition of a sentence of death; whether sufficient mitigating circumstances existed which approached or exceeded the weight given to the aggravating circumstances; or whether the sentence of death was excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

A jury found that for each murder, evidence at Galindo's aggravation hearing supported the existence of five statutory aggravating circumstances set forth in § 29-2523(1): (a) Galindo had a substantial prior history of serious assaultive or terrorizing criminal activity, based on evidence of his involvement in the murder of Lundell, committed before the bank robbery; (b) the murder was committed in an effort to conceal the identity of the perpetrator; (d) the murder was especially heinous, atrocious, or cruel, or manifested exceptional depravity; (e) at the time of the murder, another murder had been committed; and (f) at the time of the murder, Galindo knowingly created a great risk of death to at least several persons.

The three-judge sentencing panel in turn received into evidence Galindo's presentence investigation report and the record from the guilt and aggravation phases of the trial. The sentencing panel held a mitigation hearing.

In addition to the mitigation testimony recounted above, the sentencing panel heard evidence about Galindo's cooperation with law enforcement. The panel heard testimony that immediately after his arrest, Galindo provided law enforcement officers with some information about the bank robbery plans and his accomplices without being offered any deals or promises. Galindo also helped law enforcement officers locate the guns from the bank robbery. The panel heard testimony that after Galindo's guilt phase was completed, he testified at an accomplice's trial with no assurance that he would receive

more lenient treatment in his own case. Regarding Lundell, evidence before the panel showed that in law enforcement interviews in January 2003, Galindo initially denied knowing anything about him. In between January and March of that year, law enforcement was able to substantially narrow down the location of Lundell's body using cadaver dogs and "information from cooperating individuals that had talked to . . . Galindo." On March 17, Lundell's body was discovered with additional direction from Galindo at the scene.

The sentencing panel heard evidence that a few months after the robbery, law enforcement learned that Galindo had planned an armed escape. Among other things, Galindo had taken steps toward smuggling a gun onto the cell block, and a makeshift blunt-force instrument was seized from him. The panel heard testimony about the mortal danger to jail staff inherent in an armed escape.

Following the mitigation hearing, the panel found no statutory mitigating circumstances. See *id.* Regarding the statutory mitigating circumstance that Galindo had "no significant history of prior criminal activity" under § 29-2523(2)(a), the sentencing panel listed Galindo's previous convictions for felony theft, misdemeanor third degree assault, alcohol and controlled substance offenses, driving under suspension, and failure to appear. It also considered Galindo's uncharged burglary of a sporting goods store, by which he obtained handguns used in the fatal bank robbery, and Galindo's participation in the Lundell murder. The sentencing panel observed that Galindo was 21 years old and concluded that "already" his criminal history was not "slight or inconsequential." See *State v. Holtan*, 197 Neb. 544, 548, 250 N.W.2d 876, 880 (1977), *disapproved on other grounds, State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986).

The sentencing panel also considered Galindo's participation in the Lundell murder as a factor in declining to find that he "acted under unusual pressures or influences or under the domination of another person" pursuant to § 29-2523(2)(b).

Other factors cited by the sentencing panel included multiple examples of Galindo's participation in the planning and preparation for the bank robbery, his actions during the bank robbery itself, and his actions in fleeing afterward.

The sentencing panel considered the nonstatutory mitigating circumstance of Galindo's cooperation with the criminal investigation but determined that this mitigating circumstance was "tempered" by his attempted escape from incarceration, which, the panel elsewhere noted, would have involved violence, if necessary, and "offset" by his lack of remorse. The sentencing panel consequently gave Galindo's cooperation with the investigation "little weight" as a mitigating circumstance.

The panel determined that the weight of the single mitigating circumstance did not approach or exceed the weight given to the five aggravating circumstances, each of which the sentencing panel found "significant and substantial." See § 29-2522. This was so, "[e]ven if the panel were to disregard" the aggravating circumstance in § 29-2523(1)(d), that "the murder was especially heinous, atrocious, [or] cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence," because the panel had "some concern with historic questions surrounding the constitutionality" of this aggravator.

The sentencing panel also found that death sentences in Galindo's case were not excessive or disproportionate to the penalties imposed in similar cases, considering both the crimes and the defendant. It based this finding on a review of 15 cases in which death sentences were pronounced, commencing in 1973.

Accordingly, the panel sentenced Galindo to death for each of the five murders committed during the bank robbery.

### (ii) Prejudice Analysis

In light of the sentencing panel's analysis, we now undertake to decide whether Galindo's remaining allegations of deficient performance and his claims that the State withheld

material evidence demonstrate prejudice. That is, we must decide whether there is a reasonable probability that the sentencing panel would not have sentenced Galindo to death if the § 29-2523(1)(a) and (d) aggravators were removed from consideration and some expressions of remorse added as a mitigating circumstance. Regarding remorse, we consider the fact that the sentencing panel also had before it statements that showed a definitive lack of remorse.

The first question to resolve is whether there is a reasonable probability that the sentencing panel would have found that the altered slate of three aggravating circumstances did not justify imposition of death sentences. See § 29-2522(1). We conclude there was no such reasonable probability. Years before Galindo was sentenced, we held that one aggravating circumstance may be sufficient under our statutory system for the sentencing court to conclude that imposition of the death penalty is appropriate. See *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001). Three aggravating circumstances surpass this threshold.

The next statutorily directed inquiry is whether there is a reasonable probability that the sentencing panel would have found the mitigating circumstances approach or exceed the weight given to the aggravating circumstances. See § 29-2522(2). Our task in answering this question is greatly aided by the sentencing panel's articulation of the relative weight it attributed to the aggravating and mitigating circumstances. Also relevant is the sentencing panel's statement that even if it were to disregard the (1)(d) aggravator, as we are doing now, it would not have altered its balancing of the aggravating and mitigating circumstances.

We are further cognizant of the impact of the alleged errors on the sentencing factors as a whole. As Galindo points out, the sentencing panel also took the Lundell murder into account in eliminating two statutory mitigators from consideration—§ 29-2523(2)(a) and (b). However, the Lundell murder was one of numerous factors the sentencing panel considered

in so finding. In declining to find that Galindo had no significant history of prior criminal activity, see § 29-2523(2)(a), the sentencing panel also observed that at age 21, Galindo had already been convicted of felony theft, misdemeanor third degree assault, alcohol and controlled substance offenses, driving under suspension, and failure to appear. It further noted that Galindo burglarized a sporting goods store to obtain handguns for the bank robbery, but was never charged. Likewise, the sentencing panel found that Galindo was not a follower who had acted under unusual pressures or influences or domination imposed by Sandoval, see § 29-2523(2)(b), citing various details in addition to the Lundell murder. These included Galindo's role in planning the bank robbery; his participation in stealing guns to be used in the bank robbery; his efforts to recruit multiple people for the scheme; and various actions during and immediately after the bank robbery, along with other criminal activity, that Galindo performed while separated from Sandoval. We are not persuaded there is a reasonable probability that omitting the Lundell murder from consideration would have changed the sentencing panel's conclusion regarding the statutory mitigators.

In our assessment, the two nonstatutory mitigating circumstances in our calculus—cooperation with law enforcement "tempered" by Galindo's attempted escape, and some remorse—do not approach or exceed the three remaining "significant and substantial" aggravating circumstances: the murder was committed in an effort to conceal the identity of the perpetrator; at the time of the murder, another murder had been committed; and at the time of the murder, Galindo knowingly created a great risk of death to at least several persons. See § 29-2523(1)(b), (e), and (f). We conclude that removal of the (1)(a) and (1)(d) aggravators and the addition of some remorse would have "altered the sentencing profile" to a degree, but we do not discern a reasonable probability that the sentencing panel would have found that the weight of the two mitigating circumstances approached or exceeded

that of the three aggravating circumstances. See *Strickland v. Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

The final question is whether there is a reasonable probability that, given the hypothetical slate of aggravating and mitigating circumstances suggested by Galindo's claims, the sentencing panel would have found that death sentences were excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. See § 29-2522(3). Recognizing that no two cases are the same, we conclude there is no such reasonable probability.

A proportionality review does not require that a court "'color match'" cases precisely. *State v. Ellis*, 281 Neb. 571, 613, 799 N.W.2d 267, 302 (2011). It would be virtually impossible to find two murder cases which are the same in all respects. *Id.* Instead, the question is simply whether the cases being compared are sufficiently similar, considering both the crime and the defendant, to provide the court with a useful frame of reference for evaluating the sentence in this case. *Id.*

The sentencing panel reviewed 15 cases, spanning decades, to support its finding that death sentences in Galindo's case were neither excessive nor disproportionate. Although based on the same aggravating and mitigating circumstances relied upon by the sentencing panel, our review found Galindo's death sentences to be proportionate on direct appeal. See *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009). We took particular note of *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982), where we affirmed a death sentence for two counts of first degree murder of two cabdrivers during the perpetration of robberies.

Even considering the adjusted aggravators and mitigators, we find *Moore* is still relevant to our analysis today. Also instructive is *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005), listing cases dating back to the 1970s in which the death penalty was imposed. And although not dispositive, it is notable that Sandoval and Vela, Galindo's accomplices,

were also sentenced to death. See, *State v. Sandoval*, 280 Neb. 309, 788 N.W.2d 172 (2010) (affirmed on direct appeal); *Vela I, supra* (affirmed on direct appeal). Upon our review of this authority, and omitting two aggravating circumstances from consideration and giving Galindo the benefit of the additional mitigating circumstance of some remorse, his offenses remain extremely grave. As we observed on direct appeal, "Galindo knowingly participated in a dangerous crime in which five innocent victims were almost immediately shot and killed without any provocation." See *State v. Galindo*, 278 Neb. at 675, 774 N.W.2d at 248. There is not a reasonable probability that recalibrating the aggravating and mitigating circumstances to correspond with Galindo's remaining ineffective assistance of counsel claims and his claims under *Brady v. Maryland*, 373 U.S.83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), would have led the sentencing panel to determine death sentences to be excessive or disproportionate in Galindo's case.

## 10. Prosecutorial Misconduct: Conflict of Interest

We now turn to Galindo's assertion that the district court erred in declining to grant an evidentiary hearing on his postconviction claim that a prosecutorial conflict of interest violated his constitutional right to due process. At the heart of Galindo's prosecutorial conflict of interest claim are many of the same allegations regarding the county attorney's criminal activities and associations that we have already discussed. As described above, Animas, Lopez, and Abendano testified at Galindo's aggravation hearing that Galindo admitted to them while they were incarcerated together that he had participated with Vela in Lundell's murder. Padilla was also endorsed as a witness, but he did not testify. Galindo's postconviction motion made factual allegations that unbeknownst to him at the time of his trial and direct appeal, the county attorney had connections that predated Galindo's trial to a drug ring that involved Padilla, Lopez, Abendano, and others.

Galindo claimed these factual allegations evidenced a prosecutorial conflict of interest, in that as a result of the county attorney's involvement with State witnesses, the county attorney's personal interests influenced his decisions in Galindo's case. In particular, Galindo asserted that it was not in the county attorney's personal interest to disclose any connection he had with the drug ring or its participants, to disclose any agreement he had with Abendano to exchange Abendano's testimony against Galindo for the county attorney's protecting Abendano from federal prosecution and in turn avoiding the disclosures about the county attorney it would occasion, and to disclose Abendano as a witness in time for Galindo's counsel to adequately prepare to cross-examine him. Galindo concluded, "The trial record shows [the county attorney's] conflict of interest affected the fairness of the proceedings and undermines confidence in the jury's verdict regarding Lundell. [The county attorney's] personal entanglement with several . . . prosecution witnesses rendered the aggravation hearing fundamentally unfair."

The district court denied postconviction relief on the issue, without an evidentiary hearing, and Galindo now challenges this ruling on appeal.

Galindo's prosecutorial conflict of interest claim is complicated by the fact that it does not appear that either the U.S. Supreme Court or this court has expressly recognized a due process right to a conflict-free prosecutor. The U.S. Supreme Court has said that a prosecutor's personal conflict of interest might "in some contexts raise serious constitutional questions." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249-50, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980). And other courts have found that a prosecutor's conflict of interest violated a defendant's right to due process. See, e.g., *Ganger v. Peyton*, 379 F.2d 709 (4th Cir. 1967); *State v. Eldridge*, 951 S.W.2d 775 (Tenn. 1997) (collecting cases); *Cantrell v. Com.*, 229 Va. 387, 329 S.E.2d 22 (1985).

Even if a prosecutor's conflict of interest can violate a defendant's right to due process, a difficult question remains as to how to identify when such a conflict does so. The question is difficult, in no small part, due to the role of prosecutors. In a sense, prosecutors are not disinterested parties to criminal prosecutions. See *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) ("[o]f course, a prosecutor need not be disinterested on the issue whether a prospective defendant has committed the crime with which he is charged"). For this reason, there is general agreement that prosecutors' participation in a case is not subject to the same conflict of interest rules that govern judges. See, *Young v. U. S. ex rel. Vuitton et Fils S. A.*, 481 U.S. 787, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987) (*Vuitton*); *People v. Vasquez*, 39 Cal. 4th 47, 137 P.3d 199, 45 Cal. Rptr. 3d 372 (2006).

It is not necessary in this case to identify the precise contours of a due process right to a conflict-free prosecutor. Rather, it is sufficient to say that we agree with those courts that have recognized that there may be situations in which a prosecutor's personal interests so undermine the fundamental fairness of a criminal proceeding that the defendant's right to due process is violated. Additionally, for the sake of this analysis, we assume that Galindo's allegations identify the type of conflict of interest on the part of a prosecutor that could rise to the level of a due process violation.

Even with the foregoing established, another difficult question remains: If Galindo has alleged facts identifying the type of prosecutorial conflict of interest that could amount to a due process violation, does that alone mean that he is entitled to an evidentiary hearing on the issue? Galindo claims that the answer to that question is yes. In support, he argues that the alleged prosecutorial conflict of interest is structural error. Structural error is the term the U.S. Supreme Court has used to refer to "a very limited class of errors that trigger automatic reversal because they undermine the fairness of a criminal proceeding as a whole." See *United States v. Davila*,

569 U.S. 597, 611, 133 S. Ct. 2139, 186 L. Ed. 2d 139 (2013) (internal quotation marks omitted).

Galindo's argument that he has alleged facts that, if proved, would amount to structural error rests primarily on the U.S. Supreme Court's opinion in *Vuitton, supra*. In that case, after parties had allegedly violated an injunction, a federal court appointed attorneys for the opposing party as special prosecutors to pursue a criminal contempt action. After convictions were entered for contempt, the contempt defendants filed an appeal contending that the appointment of special prosecutors with an interest in the outcome violated their right to be prosecuted by an impartial prosecutor. Under its supervisory power over the federal courts, the U.S. Supreme Court reversed and held that "counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order." *Id.*, 481 U.S. at 809.

A four-justice plurality of the U.S. Supreme Court in *Vuitton* also concluded that the error was not subject to harmless error review. The plurality reasoned that appointing an interested prosecutor has pervasive effects "and therefore requires scrutiny of . . . the conduct of an entire prosecution, rather than simply a discrete prosecutorial decision." *Id.*, 481 U.S. at 812. The plurality determined that because it would be very difficult to determine any effect the conflict had on the special prosecutor's discretion, harmless error review should not be available. In an opinion concurring in part and dissenting in part, three justices disagreed with the plurality's determination that the issue was not subject to harmless error review.

We disagree with Galindo's argument that *Vuitton* compels the conclusion that he has alleged facts that, if proved, would amount to structural error. First, *Vuitton* was not decided based on the Due Process Clause, but on the Court's supervisory power over contempt proceedings. See *Webber v. Scott*, 390 F.3d 1169 (10th Cir. 2004). See, also, Bruce A. Green & Rebecca Roiphe, *Rethinking Prosecutors' Conflicts of*

*Interest*, 58 B.C. L. Rev. 463 (2017). Further, the portion of *Vuitton* finding structural error upon which Galindo relies was not joined by a majority of the Court. See *Webber v. Scott, supra* (observing that plurality of court in *Vuitton* found appointment of private prosecutor was not subject to harmless error analysis).

While the foregoing facts persuade us that *Vuitton* is not binding in this case, even if it were, we believe the facts here are distinguishable. The conflict that posed a problem in *Vuitton* was that the special prosecutors were counsel to a party that was a beneficiary of the court order the contempt defendants were alleged to have violated. In that situation, the special prosecutors could use the threat of prosecution as a weapon in civil negotiations and therefore had an interest in pursuing and obtaining a conviction. As discussed above, the *Vuitton* plurality concluded that automatic reversal was required, in part because it did not believe it would be possible to determine how the special prosecutor's interest in the contempt proceeding affected the various discretionary decisions that would have been made during the case.

The conflict Galindo has alleged is different. His allegations do not suggest that the county attorney had a personal interest against Galindo or in a particular outcome in Galindo's case such that the entire prosecution or penalty phase is called into question. Rather, Galindo alleges that the county attorney had an interest in being able to use Abendano as a witness against Galindo as part of an effort to shield himself from criminal investigation and an interest in failing to disclose his own connections to the drug ring. These interests, Galindo alleges, prompted the county attorney to rely on Abendano as a witness in support of the allegation that Galindo was involved in the Lundell murder and to fail to disclose his allegedly unsavory connections to Abendano and others who testified regarding the Lundell murder. According to Galindo, then, the alleged conflict influenced how the prosecutor went about trying to prove that Galindo was involved in the Lundell

murder. As Galindo himself alleges in his motion for postconviction relief, the conflict of interest "undermines confidence in the jury's verdict regarding Lundell."

We recognize that Galindo's brief speculates that the alleged conflict of interest "may have also influenced [the county attorney's] decision to even seek the death penalty against Galindo." Brief for appellant at 64. Galindo's motion, however, does not refer to such a theory or make such an allegation. Because the district court could not err by failing to consider this theory not presented in the postconviction motion, we do not consider it here. See *State v. Ammons*, 314 Neb. 433, 900 N.W.2d 897 (2023).

With the proper alleged conflict in view, we do not believe Galindo has alleged facts that, if proved, would amount to structural error, for reasons we will explain.

Most constitutional errors are not structural errors and are thus subject to harmless error analysis. See, *Rose v. Clark*, 478 U.S. 570, 578, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986) (structural errors are "the exception and not the rule"). A defining characteristic of errors that are subject to harmless error analysis is that they occur "during the presentation of the case to the jury" and therefore may "be quantitatively assessed in the context of other evidence presented in order to determine whether [the] admission was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 307, 308, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). Structural error, on the other hand, "def[ies] analysis by 'harmless-error' standards" because it "affect[s] the framework within which the trial proceeds" and is not "simply an error in the trial process itself." *Id*., 499 U.S. at 309, 310. See, also, *Brecht v. Abrahamson*, 507 U.S. 619, 630, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (explaining that structural errors "infect the entire trial process"). The U.S. Supreme Court has instructed that "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other

errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. at 579.

We believe the prosecutorial conflict of interest alleged by Galindo is not structural error. As we have discussed, Galindo has not alleged facts suggesting that the county attorney had a particular ax to grind against him or an interest in a particular outcome in his prosecution. Rather, Galindo's allegations, at most, suggest that the county attorney had an interest in having Abendano offer testimony regarding one aggravator in the penalty-phase proceedings and in failing to disclose his own criminal connections to others who testified against Galindo with respect to that same aggravator. Even assuming it was the county attorney's personal interests that led him to pursue and present this testimony and fail to disclose evidence that would cast doubt on the same, the impact of that evidence on Galindo's eventual death sentences can "be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt" and would not infect the entire trial process. *Arizona v. Fulminante*, 499 U.S. at 308. We note that several courts both before and after the U.S. Supreme Court's decision in *Vuitton* have either subjected prosecutorial conflict of interest claims to harmless error review or held that a defendant raising such a claim must make some showing of prejudice. See, e.g., *Webber v. Scott*, 390 F.3d 1169 (2004); *U.S. v. Terry*, 17 F.3d 575 (2d Cir. 1994); *United States v. Heldt*, 668 F.2d 1238 (D.C. Cir. 1981); *Ganger v. Peyton*, 379 F.2d 709 (4th Cir. 1967); Bruce A. Green & Rebecca Roiphe, *Rethinking Prosecutors' Conflicts of Interest*, 58 B.C. L. Rev. 463 (2017). We similarly conclude that the allegations in Galindo's motion, even if proved, would not amount to structural error.

Because Galindo has not alleged facts that would amount to structural error, our analysis of this issue is not complete, even assuming he has alleged facts that would amount to a constitutional violation. Our cases have recognized that in

Nebraska, postconviction relief is a very narrow category of relief, available only to remedy *prejudicial* constitutional violations that render the judgment void or voidable. See, e.g., *State v. Lotter*, 311 Neb. 878, 976 N.W.2d 721 (2022). Consistent with that understanding, we have held that the defendant in a postconviction proceeding has the burden of alleging and proving that a claimed error is prejudicial. See, e.g., *State v. Harris*, 274 Neb. 40, 735 N.W.2d 774 (2007). We have also recognized that an error is not prejudicial if we are persuaded that it is harmless beyond a reasonable doubt. See, e.g., *State v. Wheeler*, 314 Neb. 282, 989 N.W.2d 728 (2023). With all these principles in mind, we understand our task as follows: We must review Galindo's motion and determine if he has alleged facts which, if proved, would amount to a prejudicial constitutional error, i.e., one that is not harmless beyond a reasonable doubt. If not, he is not entitled to an evidentiary hearing.

Before turning to that analysis, we digress briefly to address an objection we anticipate Galindo might lodge to our approach. We do not believe our approach is inconsistent with the U.S. Supreme Court's opinion in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), and its progeny to the extent those cases hold that the prosecution has the burden of demonstrating that an error is harmless. First, we note that while it is clear that the *Chapman* harmless error standard must be applied when constitutional error is found on a direct appeal, it is far less clear that a state court must apply that standard in a collateral attack on convictions such as these. Indeed, some state courts do not apply the *Chapman* harmless error standard in postconviction challenges to a conviction. See, e.g., *Banks v. Com'r of Correction*, 339 Conn. 1, 259 A.3d 1082 (2021) (collecting cases from state courts declining to apply *Chapman* harmless error standard on collateral review of constitutional errors); *Matter of Hagler*, 97 Wash. 2d 818, 826, 650 P.2d 1103, 1108 (1982) ("[o]n collateral review, we shift the burden to the petitioner to establish that the error

was not harmless"). See, also, *Brown v. Davenport*, __ U.S. __, 142 S. Ct. 1510, 1530, 212 L. Ed. 2d 463 (2022) ("*Chapman* merely announced the default burden of proof for evaluating constitutional errors on direct appeal"). And the U.S. Supreme Court has held that federal courts, when entertaining collateral constitutional challenges to state court convictions, should apply a standard other than the *Chapman* harmless error standard. See *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).

But even setting to the side whether we are obligated to apply the *Chapman* harmless error standard in this postconviction proceeding, we do not believe our approach is inconsistent with that standard. In *Chapman* itself, the Court said it was holding that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. Courts have understood *Chapman* to place a burden of persuasion on the prosecution to show that any error was harmless, see, e.g., *U.S. v. Crochiere*, 129 F.3d 233 (1st Cir. 1997), and to require that doubts about whether the standard has been met be resolved in favor of the defendant, see *O'Neal v. McAninch*, 513 U.S. 432, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995). But the approach we apply today does not shift any burden of persuasion or require the resolution of close cases against the defendant. Instead, we consider whether, assuming Galindo proves the facts alleged in his motion, we can nonetheless declare a belief that any constitutional error based on those allegations would be harmless beyond a reasonable doubt. We proceed to that analysis now.

Having decided to subject Galindo's prosecutorial conflict of interest claim to harmless error analysis, we conclude that he is not entitled to an evidentiary hearing on this issue, because, assuming he can establish the requisite conflict of interest, we find beyond a reasonable doubt that it would not amount to more than harmless error. As discussed above, Galindo asserted in his motion that the alleged prosecutorial

conflict of interest affected the way the county attorney went about proving that he was involved in the killing of Lundell and undermines confidence in the jury's finding on that issue. But even if the alleged conflict affected the evidence the county attorney presented and failed to disclose regarding the killing of Lundell, we are confident beyond a reasonable doubt that even without any evidence of Galindo's involvement in killing Lundell and concealing his body, the sentencing panel would have imposed the same sentences.

Omitting the Lundell murder and resulting aggravating circumstance from consideration would leave multiple aggravating circumstances. Evidence connecting Galindo to the Lundell murder served to prove the aggravating circumstance that Galindo had a substantial prior history of serious assaultive or terrorizing criminal activity. See § 29-2523(1)(a). Absent this aggravating circumstance, there are three aggravators which Galindo has not challenged on postconviction and which the sentencing panel found "significant and substantial." These aggravators would have remained to justify imposition of the death penalty under § 29-2522(1) and for the sentencing panel to weigh against any mitigating circumstances it found pursuant to § 29-2522(2): The murders were committed in an effort to conceal the commission of a crime or the identity of the perpetrator of such crime; at the time each murder was committed, another murder had been committed; and at the time each murder was committed, Galindo knowingly created a great risk of death to at least several people. See § 29-2523(1)(b), (e), and (f). See, also, *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001) (one aggravating circumstance may be sufficient under our statutory system for sentencing court to conclude imposition of death penalty is appropriate).

We are also confident that removing evidence of the Lundell murder would not have made an appreciable difference in the mitigators that the sentencing panel applied. The sentencing panel did not find any statutory mitigators to

exist. As we explained earlier, although the sentencing panel mentioned the Lundell murder in eliminating two statutory mitigators from consideration—that the offender had "no significant history of prior criminal activity," § 29-2523(2)(a), and that the offender "acted under unusual pressures or influences or under the domination of another person," § 29-2523(2)(b)—it was but one of numerous factors the sentencing panel cited in deciding not to credit these mitigators to Galindo. We have no reasonable doubt that the sentencing panel still would not have given Galindo the benefit of these statutory mitigators if the Lundell murder had been taken out of the equation. We conclude beyond a reasonable doubt that the sentencing panel would not have found mitigating circumstances to approach or exceed at least three "significant and substantial" aggravating circumstances. See § 29-2522(2).

We find confirmation for our approach and our conclusion in *State v. Sandoval*, 280 Neb. 309, 788 N.W.2d 172 (2010). Like Galindo, Sandoval was sentenced to death for each of the five homicides committed during the bank robbery. On direct appeal, he argued that the district court erred in overruling his objection to the jury instruction for the (1)(d) aggravator. We found error, but we determined that it was harmless. Our harmless error analysis examined whether the sentencing panel would have imposed the death penalty beyond a reasonable doubt absent consideration of the (1)(d) aggravator and concluded it would have. In reaching this conclusion, we applied the aggravating circumstances in § 29-2523(1)(b), (e), and (f) and observed that the sentencing panel assigned each aggravator "'significant and substantial'" weight. *State v. Sandoval*, 280 Neb. at 363, 788 N.W.2d at 218. We reasoned that had the sentencing panel considered these three aggravators alongside no statutory mitigators and only one nonstatutory mitigator— Sandoval's bad childhood—to which the panel gave "'little weight,'" it would have imposed the death sentences beyond a reasonable doubt. *Id.*

Galindo argues that the district court erred in referencing *Sandoval* in concluding that Galindo was not entitled to an evidentiary hearing on his postconviction claims. He asserts this amounted to "simply treat[ing] Galindo like Sandoval," brief for appellant at 40, and deprived him of "precision that individualized consideration demands." See *Stringer v. Black*, 503 U.S. 222, 231, 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992). We agree that our harmless error determination in *Sandoval* does not automatically mean that any prosecutorial conflict of interest here was harmless. At the same time, however, we find *Sandoval* to be instructive as to how we perform a harmless error analysis when removing an aggravating circumstance from consideration.

We further conclude beyond a reasonable doubt that if the Lundell murder had not been before the sentencing panel, it would still not have found that death sentences were excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. See § 29-2522(3). As we have already observed, this inquiry does not require a court to "'color match'" cases precisely. See *State v. Ellis*, 281 Neb. 571, 613, 799 N.W.2d 267, 302 (2011). It asks only whether the cases being compared are sufficiently similar, considering both the crime and the defendant, to provide the court with a useful frame of reference for evaluating Galindo's sentences. See *id*. Above, we noted the comparative cases considered by the sentencing panel and by this court on direct appeal. See *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009). We further noted that Sandoval and Vela, Galindo's accomplices, were also sentenced to death. See, *State v. Sandoval*, 280 Neb. 309, 788 N.W.2d 172 (2010) (affirmed on direct appeal); *Vela I, supra* (affirmed on direct appeal). Taking the Lundell murder out of the calculus, any impact on this proportionality analysis is negligible. Beyond a reasonable doubt, we conclude that even with this adjustment, the sentencing panel would not have determined death sentences to be excessive or disproportionate in Galindo's case.

Although we conclude on the record before us that Galindo's prosecutorial conflict of interest claim could amount to nothing more than harmless error and he is therefore not entitled to an evidentiary hearing on the issue, our decision should in no way be understood as minimizing or countenancing the seriousness of the allegations against the county attorney in this case. It would be a great understatement to say that the county attorney would be deserving of serious condemnation if these allegations are true. Our analysis here, however, must principally focus not on the blameworthiness of the county attorney, but on whether Galindo sufficiently alleged a claim for postconviction relief. For the reasons we have discussed, we conclude that he has not. We find that the district court did not err in declining to grant an evidentiary hearing on this issue.

### 11. Prosecutorial Misconduct: Knowing Use of False Testimony

Finally, Galindo relies on the well-established rule that a criminal defendant's due process rights are violated whenever the prosecution's case includes false evidence that is material to the outcome, which the prosecution either knew or should have known was false. See, *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 76, 31 L. Ed. 2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). Galindo assigns that the district court erred in denying him an evidentiary hearing on his postconviction claims that the State violated his due process rights when it knowingly introduced false testimony by Barritt, Animas, and Abendano at the aggravation hearing. For all three witnesses, that testimony was confined to matters relating to the Lundell murder. Even assuming these postconviction claims allege the knowing use of false testimony and are not procedurally barred, we conclude Galindo cannot show the claimed false testimony was material.

As we have explained, Barritt, Animas, and Abendano testified that Galindo admitted he assisted in killing Lundell

and disposing of his body. Citing Barritt's testimony at the trial of one of Galindo's accomplices, Galindo argues that he was entitled to postconviction relief on his claim that the county attorney knowingly presented false evidence at his aggravation hearing when Barritt testified that she had not been promised anything in exchange for information about the Lundell murder. Regarding Animas' testimony that Galindo said he participated in killing and disposing of Lundell's body, Galindo asserts that the fact that he never received a requested recording of a police interview in which Animas implicated Galindo, combined with Animas' pretrial and posttrial statements averring that Galindo said he was *not* involved in any way with Lundell's death, "suggests" that the county attorney knew Animas' testimony at the aggravation hearing was false. Brief for appellant at 60. And Galindo posits that the "circumstances surrounding" Abendano—his status as a jailhouse informant and his and the county attorney's drug-ring associations— "suggest his testimony cannot be trusted." *Id*. at 59.

When we recall the fundamental principles that apply to postconviction review, it is not clear to us that any of these claims, at the most basic level, qualify for an evidentiary hearing. For instance, we have consistently said that a motion for postconviction relief cannot be used to secure review of issues that were known to the defendant and which were or could have been litigated on direct appeal; and we see indications in the record that Galindo could have addressed Barritt's allegedly false testimony on direct appeal. See *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022). See, also, *State v. Lotter*, 311 Neb. 878, 976 N.W.2d 721 (2022). We have also repeatedly said that an evidentiary hearing is not required on a motion for postconviction relief when the motion alleges only conclusions of fact or law without supporting facts. See *State v. Lessley, supra*. With this proposition in mind, we question whether Galindo's false testimony allegations pertaining to Barritt, Animas, and Abendano assert facts showing that their testimony was indeed false and that

the prosecution knew it. But even assuming without decid-
ing that Galindo's false testimony claims have surmounted
the aforementioned obstacles, we conclude that they cannot
succeed, because Galindo cannot show the alleged false testi-
mony was material.

Regarding materiality, it has long been held that "a convic-
tion obtained by the knowing use of perjured testimony is
fundamentally unfair, and must be set aside if there is any rea-
sonable likelihood that the false testimony could have affected
the judgment of the jury." *United States v. Agurs*, 427 U.S. 97,
103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). See, also, *State
v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012), *disap-
proved on other grounds, State v. Avina-Murillo*, 301 Neb. 185,
917 N.W.2d 865 (2018). In this challenge to the penalty-phase
proceedings, application of that materiality standard would
require that Galindo's death sentences be set aside if there was
any reasonable likelihood that the false testimony could have
affected those sentences.

We are aware that there is some disagreement among courts
as to whether, in a collateral attack on a conviction, the defend-
ant is entitled to relief merely upon a showing that there was
a knowing presentation of false testimony and a satisfaction
of the materiality standard described above. This disagreement
is, in part, about the scope of the U.S. Supreme Court's opinion
in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123
L. Ed. 2d 353 (1993). *Brecht* held that in determining whether
relief should be granted in a collateral attack on a conviction,
federal courts should ask whether the error "'had substantial
and injurious effect or influence in determining the jury's
verdict,'" rather than the more defendant-friendly harmless-
beyond-a-reasonable-doubt standard that applies on direct
review. *Id*., 507 U.S. at 637, quoting *Kotteakos v. United States*,
328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946). Some
federal courts, in reliance on *Brecht*, have held that such relief
should only be granted on a knowing presentation of false
testimony claim raised in a collateral attack if the standard

articulated in *Brecht* is satisfied. See, e.g., *Rosencrantz v. Lafler*, 568 F.3d 577 (6th Cir. 2009). Other federal courts disagree and have held that the *Brecht* standard does not apply to a knowing presentation of false testimony claim. See, e.g., *Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005). Beyond that disagreement, courts also divide on whether the *Brecht* standard is ever proper as a harmlessness standard for collateral review of constitutional errors in state courts. See, e.g., *Banks v. Com'r of Correction*, 339 Conn. 1, 259 A.3d 1082 (2021) (collecting cases).

In this case, we see no need to wade into the disagreements referenced above, because we find that Galindo is not entitled to an evidentiary hearing even assuming the *Brecht* standard does not apply. We reach this conclusion because even if his allegations are proved, there is no reasonable likelihood that the false testimony could have affected Galindo's death sentences. As to why that is the case, there is little left to say. We have already explained that we are confident beyond a reasonable doubt that the sentencing panel would have imposed the same sentences absent any evidence regarding the Lundell murder. All of the testimony that is the subject of Galindo's knowing presentation of false evidence claim related to the Lundell murder. And the materiality standard applicable to such claims has been held to be equivalent to the harmless-beyond-a-reasonable doubt standard. See, *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Haskell v. Superintendent Greene SCI*, 866 F.3d 139 (3d Cir. 2017). Accordingly, we conclude that Galindo's motion does not contain factual allegations which, if proved, constitute an infringement of his constitutional rights. See *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022). The district court did not err in denying Galindo an evidentiary hearing on his postconviction claim that the prosecution violated his due process rights by knowingly presenting false testimony.

The same reasoning provides an alternative basis for our conclusion that Galindo is not entitled to an evidentiary

hearing on his claim that the State violated his right to counsel under *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), and its progeny, as a result of the county attorney's alleged elicitation of statements from him via informants. The statements Galindo alleges were elicited from him or fabricated in violation of his right to counsel pertained solely to the Lundell murder, and *Massiah* violations are subject to harmless error review. See *Milton v. Wainwright*, 407 U.S. 371, 92 S. Ct. 2174, 33 L. Ed. 2d 1 (1972).

## V. CONCLUSION

For the foregoing reasons, we affirm the district court order denying Galindo postconviction relief without an evidentiary hearing.

Affirmed.

Heavican, C.J., and Freudenberg, J., not participating.

Papik, J., concurring in part, and in part dissenting.

I agree with almost all of the majority opinion. Galindo raised numerous claims in his postconviction motion, and, with respect to all but one of those claims, I do not believe he was entitled to an evidentiary hearing for the reasons the majority articulates. In my view, however, the district court should have granted an evidentiary hearing on Galindo's claim that his due process rights were violated as a result of a conflict of interest on the part of the county attorney. I write separately to explain my reasoning.

Galindo's prosecutorial conflict of interest claim is rooted in allegations that the county attorney was involved in a criminal drug ring. Galindo does not challenge his underlying convictions but claims that the county attorney's criminal exposure influenced his decisions in the aggravation phase of Galindo's case. Specifically, Galindo's postconviction motion alleged that the aggravation phase of his case provided the county attorney with an opportunity to attempt to shield himself from federal scrutiny of his own criminal activities through the

following scheme: Participants in the drug ring would testify against Galindo by implicating him in the death of Travis Lundell, and that testimony would allow the county attorney to recommend against further federal investigation of the drug ring's participants and reduce the chances that federal authorities would discover his own connections to the drug ring.

As the majority opinion observes, there is not a great deal of authority from the U.S. Supreme Court or other courts on whether and under what circumstances a defendant's due process rights can be violated based on a prosecutorial conflict of interest. Even so, I believe it follows from general due process principles that Galindo's allegations, if proved, could form the basis of a due process violation.

Although the U.S. Supreme Court has said that courts are not free in defining due process to impose their own personal and private notions of fairness, it has also recognized that the Due Process Clause stands in the way of state action that "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, . . . and which define the community's sense of fair play and decency." *Dowling v. United States*, 493 U.S. 342, 353, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990) (internal quotation marks omitted). One of the fundamental aspects of our criminal justice system is that, as this court recognized over a century ago, the prosecutor is "called upon to exercise a sound discretion" in deciding who and what to prosecute, and "there should not be anything in the way of private interest to possibly sway that judgment or to tempt him to depart from a disinterested and conscientious discharge of his duty." *Ress v. Shepherd*, 84 Neb. 268, 269-70, 120 N.W. 1132, 1133 (1909). If, as alleged here, a prosecutor's personal interests in avoiding criminal investigation and prosecution influenced his or her prosecutorial decisions in a particular case, that would seem to violate fundamental conceptions of justice and thus be capable of forming the basis of a due process violation.

But the idea that Galindo's allegations, if proved, could form the basis of a due process claim is not the primary point of contention regarding this claim. The State made no argument that Galindo's allegations of a prosecutorial conflict of interest could not form the basis of a due process claim, and the majority likewise assumes that Galindo has alleged facts regarding a prosecutorial conflict of interest that, if proved, could support a due process violation.

At issue instead is whether Galindo would automatically be entitled to relief if he proved the alleged conflict of interest or whether some consideration must also be given to whether the conflict affected the ultimate outcome and, if so, how to conduct that analysis. On this point, Galindo argues that the prosecutorial conflict of interest is the type of structural error that would automatically entitle him to relief if he proved the conflict of interest allegations. The majority rejects this argument and finds that even if Galindo proved his conflict of interest allegations, the conflict could not amount to anything more than harmless error.

As there is not a lot of clear authority on whether a defendant has a due process right to a disinterested prosecutor, it should come as no surprise that there is also not a lot of clear authority on whether the analysis of such a due process claim requires consideration of whether the conflict of interest harmed the defendant and, if so, the standard for considering that question. Galindo relies heavily on *Young v. U. S. ex rel. Vuitton et Fils S. A.*, 481 U.S. 787, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987), for his argument that a conviction achieved by a conflicted prosecutor is structural error and thus requires no analysis of how the conflict might have affected the outcome. As the majority correctly points out, however, the reversal in that case was not on constitutional grounds and the portion of that opinion finding the error was structural was not joined by a majority of the court.

Further, among those courts that have concluded that a due process claim based on a conflicted prosecutor is subject

to some type of assessment of harm, courts have applied a variety of standards. Some courts seem to have concluded that a defendant has a due process right to a disinterested prosecutor, but that even if the prosecutor is conflicted, the claim is subject to harmless error review. See, e.g., *Ganger v. Peyton*, 379 F.2d 709 (4th Cir. 1967). See, also, *Young, supra* (Powell, J., concurring in part and in part dissenting; Rehnquist, C.J., and O'Connor, J., join) (concluding that participation of interested prosecutors should be subject to harmless error review). Some have determined that a defendant must prove that the conflict resulted in prejudice. See, e.g., *U.S. v. Heldt*, 668 F.2d 1238 (D.C. Cir. 1981). See, also, Bruce A. Green & Rebecca Roiphe, *Rethinking Prosecutors' Conflicts of Interest*, 58 B.C. L. Rev. 463 (2017). Still others have required the defendant to show only a "reasonable potential for prejudice." See, e.g., *People v. Zimmer*, 51 N.Y.2d 390, 395, 414 N.E.2d 705, 707, 434 N.Y.S.2d 206, 208 (1980). One court has additionally urged that the standard should shift depending on whether the challenge to the prosecutor's independence is made at trial, on direct appeal, or in a collateral attack. See *Wright v. United States*, 732 F.2d 1048 (2d Cir. 1984).

Given the lack of clear guidance from the U.S. Supreme Court and the variety of approaches employed by other courts in evaluating a due process claim based on a conflicted prosecutor, it is, in my view, difficult to determine how such a claim should ultimately be resolved. At this stage of the case, however, we are not ultimately resolving Galindo's claim. We are deciding only whether he should receive an evidentiary hearing on the claim. And even assuming that the standard most friendly to the State ultimately applies, i.e., Galindo must prove both the alleged conflict on the part of the county attorney and that the conflict prejudiced him, I believe Galindo's allegations are sufficient to merit an evidentiary hearing.

As detailed above, Galindo has alleged that the county attorney had a conflict arising from his own personal criminal exposure. As for prejudice, I acknowledge that Galindo

primarily alleges that the county attorney's personal interests influenced the way he went about attempting to prove that Galindo was involved in the Lundell murder. And, I share the majority's confidence that the sentencing panel would have imposed the same sentences even if the jury had not found the aggravating circumstance based on the Lundell murder. That said, I do not believe we can assess whether a prosecutorial conflict of interest prejudiced Galindo based solely on asking whether the sentencing panel would have imposed death sentences even if the Lundell murder was taken out of the equation. In addition to allegations that the county attorney's alleged conflict undermines confidence in the jury's findings regarding the Lundell murder, Galindo's postconviction motion alleged that the county attorney's conflict affected the fairness of the proceedings and would have made the county attorney subject to a motion for disqualification had Galindo known of the conflict at the time. Galindo thus alleged that the county attorney's *participation* in the penalty phase of the proceedings violated his right to due process. Accordingly, I believe prejudice must be assessed by determining whether the same sentences would have been imposed had the case been prosecuted by a nonconflicted prosecutor.

In my view, determining what would have happened if the case was prosecuted by a nonconflicted prosecutor is not as simple as analyzing the evidence introduced at trial and the aggravating and mitigating circumstances found by the jury and the sentencing panel and determining whether the absence of a particular aggravating circumstance would have affected the ultimate sentences imposed. As the U.S. Court of Appeals for the Fourth Circuit explained in rejecting an argument that the participation of a conflicted prosecutor was harmless error, "we do not know and cannot now ascertain what would have happened if the prosecuting attorney had been free to exercise the fair discretion which he owed to all persons charged with crime in his court." *Ganger v. Peyton*, 379 F.2d 709, 714 (4th Cir. 1967). To be sure, it strikes me

as possible, and perhaps even likely, that a nonconflicted prosecutor also would have successfully pursued the death penalty against Galindo. But given the substantial discretion that is invested in prosecutors and, more importantly, the lack of any evidence at this stage as to what a nonconflicted prosecutor would have done, I do not see a basis to now determine that Galindo could not establish that the outcome of the penalty phase would have been different with a disinterested prosecutor.

Because I cannot say at this stage that Galindo is incapable of proving a constitutional violation that would render his sentences void or voidable, I would grant him an evidentiary hearing on his claim that the county attorney's conflict of interest violated his due process rights. Even if granted this hearing, Galindo would be a long way from obtaining relief from his death sentences; while his allegations about the county attorney's behavior are serious to say the least, at this stage, they are mere allegations. But, for the reasons explained herein, I believe he is at least entitled to an evidentiary hearing on this claim. I respectfully dissent from the portion of the majority opinion that holds otherwise.

Miller-Lerman, J., joins in this concurrence and dissent.

Miller-Lerman, J., dissenting in part.

Along with Justice Papik's partial dissent in which I join, I write summarily only to say that in a death penalty case, the penalty phase prosecuted by a prosecutor with a conflict should not be left unexamined. I would grant an evidentiary hearing on the allegations pertaining to the penalty proceedings.